Attorney Grievance Comm'n v. James Andrew Markey and Charles Leonard Hancock, Misc. Docket AG No. 5, September Term, 2019

**ATTORNEY DISCIPLINE – SANCTIONS – INDEFINITE SUSPENSION –** Court of Appeals indefinitely suspended from practice of law in Maryland two lawyers who, for approximately seven years, while working for federal government, participated in exchange of e-mails among group of employees, who were also lawyers, using official government e-mail addresses during work hours to make disturbingly inappropriate and offensive statements that demonstrated bias or prejudice based upon race, sex, national origin, sexual orientation, or socioeconomic status about Hispanic, Asian, and African American people, and people whom they referred to as gay men, who were their colleagues. Such conduct violated Maryland Lawyers' Rules of Professional Conduct ("MLRPC") 8.4(d) (Conduct That Is Prejudicial to Administration of Justice), 8.4(e) (Bias or Prejudice), and 8.4(a) (Violating MLRPC).

Circuit Court for Montgomery County
Case No. 468469-V

Argued: Oral argument waived/submitted on papers

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Docket AG No. 5

September Term, 2019

_____

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

JAMES ANDREW MARKEY AND
CHARLES LEONARD HANCOCK

_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

_____

Opinion by Watts, J.
McDonald, J., joins opinion and concurs.

_____

Filed: June 26, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

This attorney discipline proceeding involves two lawyers who, for approximately seven years, while working for the federal government, participated in an exchange of e-mails among a group of federal government employees, who were also lawyers, using their official government e-mail addresses during work hours to make disturbingly inappropriate and offensive statements that demonstrated "bias or prejudice based upon race, sex, . . . national origin, . . . sexual orientation[,] or socioeconomic status," Maryland Lawyers' Rules of Professional Conduct ("MLRPC")[1] 8.4(e) (Bias or Prejudice), about Hispanic, Asian, and African American people, and people whom they referred to as gay men, who were their colleagues.

James Andrew Markey and Charles Leonard Hancock, Respondents, members of the Bar of Maryland, worked as a Veterans Law Judge and an Attorney-Advisor, respectively, at the Board of Veterans' Appeals ("the Board"), which is part of the United States Department of Veterans Affairs ("the Department"). For approximately seven years, Markey, Hancock, and three other employees of the Board used their official Department e-mail addresses to participate in an e-mail chain that they called "the Forum of Hate" ("FOH"). They referred to themselves as FOH members. As members of the FOH, Markey and Hancock sent numerous e-mails that included statements about their Board colleagues that were highly offensive, and that frequently evinced "bias or prejudice based upon race, sex, . . . national origin, . . . sexual orientation[,] or socioeconomic status." MLRPC 8.4(e).

---

[1]Effective July 1, 2016, the MLRPC were renamed the Maryland Attorneys' Rules of Professional Conduct, or MARPC, and renumbered. We will refer to the MLRPC because the misconduct at issue occurred before this change.

As examples, in one instance, in response to a photograph of Hancock's son's all-white Little League team, Markey asked where the white sheets were and stated "'[b]onfire' after every victory[,]" referencing the Ku Klux Klan, and, in another, Markey referred to an African American woman Chief Veterans Law Judge as "a total b[****.]" Among many other examples, Hancock referred to the Chief Veterans Law Judge as a "Ghetto Hippopotamus" and "a despicable impersonation of a human woman, who ought to [have] her cervix yanked out of her by the Silence of the Lamb[s] guy, and force[-]fed to her."[2] The Veterans Affairs Office of Inspector General discovered the e-mails, the Veterans Administration terminated Markey, and Hancock voluntarily retired. Eventually, Markey's and Hancock's actions came to Bar Counsel's attention.

On May 30, 2019, on behalf of the Attorney Grievance Commission, Petitioner, Bar Counsel filed in this Court a "Petition for Disciplinary or Remedial Action" against Markey and Hancock, charging them with violating MLRPC 8.4(d) (Conduct That Is Prejudicial to the Administration of Justice), 8.4(e) (Bias or Prejudice), and 8.4(a) (Violating the MLRPC).

On June 4, 2019, this Court designated the Honorable Alison L. Asti of the Circuit Court for Anne Arundel County to hear the attorney discipline proceeding. Bar Counsel and Markey filed a joint motion to transfer venue to the Circuit Court for Montgomery County because Markey lived in Montgomery County and Hancock lived in Frederick

---

[2]The "*Silence of the Lambs*" is a movie about "a cannibalistic serial killer[.]" <u>Green v. Franklin Nat'l Bank of Minneapolis</u>, 459 F.3d 903, 907 & n.2 (8th Cir. 2006).

County.  As a result, this Court designated the Honorable James A. Bonifant ("the hearing judge") of the Circuit Court for Montgomery County to hear the attorney discipline proceeding.  On November 12, 2019, the hearing judge conducted a hearing.[3]  On January 2, 2020, the hearing judge filed in this Court an opinion including findings of fact and conclusions of law, concluding that Markey and Hancock had violated MLRPC 8.4(d), 8.4(e), and 8.4(a).

On February 5, 2020, this Court scheduled oral argument for April 2, 2020.  On March 17, 2020, due to the COVID-19 emergency, the Chief Judge of this Court issued an Administrative Order, postponing oral arguments that had been scheduled for April 2020 until further notice.[4]  Bar Counsel filed a Request to Waive Oral Argument.  On March 27, 2020, this Court issued a Show Cause Order, directing Markey and Hancock to show cause why oral argument should be heard.  Markey has not filed a response to the Show Cause Order, or anything else, in this Court.  Hancock filed a handwritten document indicating that oral argument was not necessary and that he did not object to the matter being considered on the record.  On April 9, 2020, this Court issued an order granting the Request to Waive Oral Argument.

For the below reasons, we indefinitely suspend Markey and Hancock from the practice of law in Maryland.

---

[3]The hearing judge noted that, at the hearing, Hancock testified, introduced evidence, and called two character witnesses, whereas Markey was present but elected not to testify or to introduce any evidence.

[4]On March 27, 2020, the Chief Judge of this Court issued another Administrative Order, rescheduling the oral arguments in question for May 2020.

## BACKGROUND

The hearing judge found the following facts, which we summarize.

On December 15, 1988, this Court admitted Hancock to the Bar of Maryland. From September 1995 to January 31, 2016, Hancock worked for the Board as an Attorney-Advisor. Hancock's main job duty was to assist Veterans Law Judges with drafting opinions regarding appeals of dispositions of veterans' claims for benefits.

On December 14, 1994, this Court admitted Markey to the Bar of Maryland. In November 1995, Markey began working for the Board as an Associate Counsel. In October 2005, Markey was promoted to Senior Counsel. In December 2007, Markey became a Veterans Law Judge. As a Veterans Law Judge, Markey conducted hearings and issued opinions regarding appeals of dispositions of veterans' claims for benefits.

The hearing judge found that beginning in 2008, and continuing into 2015, Markey, Hancock, Chief Veterans Law Judge Dennis Chiappetta, and lawyers Bernard DoMinh and John Prichard,[5] all of whom were employees of the Board, exchanged numerous inappropriate and offensive e-mails using their official Department e-mail addresses. Markey, Hancock, Chiappeta, DoMinh, and Prichard referred to the e-mail chain as the Forum of Hate and referred to themselves as members of the FOH. The e-mails included, in the hearing judge's words, "many racist, misogynic, xenophobic, and homophobic statements."

---

[5]Chiappeta, DoMinh, and Prichard are not members of the Bar of Maryland.

The hearing judge provided numerous examples of such e-mails.[6]  As one example, on January 14, 2008, an e-mail exchange consisted of the following:

> [] DoMinh: Hooray!  Eye weel be go-eeng choo San Peet weeth my boddy Jeeemi.  We weel hav good time, si?  Eet weel be FIESTA time!
>
> [] Markey: Thankfully he stays at his own house when he's there...so there will be limited social interaction.  Perhaps we'll go out for a taco lunch or something.
>
> ***
>
> [] Hancock: His photo shows semi-bloated face, like AA's does.  They BOTH gobble j[***]?
>
> [] Markey: Yes, Regan's
>
> [] DoMinh: HARSH!
>
> [] Hancock: Hey Trendy – There may be a spot open in AA's Forum of Gayness.
>
> [] DoMinh: Filled to capacity already between El Rojo and Baby Gap.
>
> [] Markey: Don't forget Geezagher and Moran
>
> [] DoMinh: They of the 'leaky reeky feaky' from their over-filled colostomy bags.

(Ellipses in original) (footnotes omitted).  Markey acknowledged that, by referring to "a taco lunch[,]" he was mocking the Deputy Vice Chairman's nationality.  The hearing judge explained that, "AA[,]" "El Rojo[,]" and "Baby Gap" were references to lawyers who

---

[6]The hearing judge's findings of fact contains quotes from a total of ten e-mail exchanges.

worked at the Board.[7]

On December 7 and 8, 2010, e-mails contained the following:

[] DoMinh: Did A-Mack leak the BVA e-mail archive to Julian Assange?

[] Hancock: No, but he like to leak some semen his way.

[] Prichard: Apparently Assange is the one who leaks. Sabotaged condom gate.

***

[] Markey: DoMinh only likes the old Fireplace on DuPont.

[] DoMinh: Coincidence that Jimmy can immediately remember the names of a DuPont bar? I think not. Jimmy probably has frequent patron discounts there, too, like El verde scores at Bobby Van's.

Close Encounters of the TURD kind indeed.

[] Hancock: Kind thought the same thing gate.

[] Markey: Yeah, walked into that one. Too easy for you guys.

I recall walking past that place on the way to the Brickskellar years ago ... and the door was propped open ... creepy looking clientele, and I'm no homophobe.

[] DoMinh: James sixth sense regarding his immediate unsettled first impression upon viewing the clientele through the open door at Fireplace is accurate. In the open forum public review website, Yelp DC, even gay dudes wrote to remark that The Fireplace is regarded as a s[***]hole in their community.

[] Hancock: Can we talk about gay stuff on the VA email system?

[] DoMinh: Riding the grommet comet ain't my thang.

---

[7]In the conclusions of law, the hearing judge found that, in above-quoted e-mail, DoMinh was ridiculing a Deputy Vice Chairman of the Board's national origin by mocking his accent.

- 6 -

[] Markey: Take me off the list.

[] DoMinh: Dupont is a TURD – world nation whose population engages in close encounters of the TURD kind.

(Ellipses in original) (brackets omitted).

 On December 21, 2012, an e-mail exchange included the following statements:

[] Prichard: In another relevant bulletin, the 2nd floor ladies room at the Butte, Montana VA clinic is out of paper towels.

[] Markey: That's where baby t will be shipped when chairman Sullivan arrives

[] Hancock: Was that place named after G-Pot?

[] DoMinh: No.  You're thinking of the VA Medical Center in the city of Giant Lard Ass Kentucky Fried Chicken Eater, North Dakota.

[] Markey: Good xmas hate gate

[] DoMinh: This workplace just fills me with the Christmas spirit and goodwill towards all.  I'm sure that G-POT, as a self-professed Christian herself, feels the same love and charitable regard to all under her leadership as well.  Oh, right she's clinical a[**]hole.  And a hypocrite, to boot.  Scratch what I just said.

[] Hancock: Not to mention a despicable impersonation of a human woman, who ought to [have] her cervix yanked out of her by the Silence of the Lamb[s] guy, and force[-]fed to her.  Whew, I might be hated out...

[] Markey: Holy s[***] gate, Batman.  Never has morale been so low, and that's saying something.

(Ellipsis in original).  Markey and Hancock acknowledged that "baby t" was short for "baby talk," and was a disparaging reference to the tone of voice of a woman who was a Vice Chairman of the Board.  The hearing judge found that "G-Pot" was short for "Ghetto Hippopotamus," and was a specific reference to an African American woman Chief

- 7 -

Veterans Law Judge.

On March 20, 2013, Hancock, Markey, and Chiappetta commented on a photograph of the Little League team of which Hancock's son was a member, and of which all of the members were white. On that date, an e-mail exchange included the following statements:

[] Hancock: First baseball practice. Not a Charo, Adrian, or BD in the bunch.

[] Markey: Nice, but where are the white sheets? Gotta start them when they are young.

[] Chiappetta: Come on James, that is the name of the kid's team: "The Maryland White Sheets."

[] Markey: Of Course, my bad. 'Bon fire' after every victory.

[] Hancock: Nice management hate. Bout time!!

The hearing judge found that that the terms "white sheets" and "Bon fire" were references to the Ku Klux Klan. The hearing judge found that the term "Charo" was "code for someone of Spanish descent[,]" the term "Adrian" was code for African Americans, and that "BD" were the initials of DoMinh, "who is Asian."

On August 28, 2013, Markey, Hancock, and DoMinh commented on photographs of DoMinh receiving an award. The photographs had been digitally altered to include derogatory terms for people of Vietnamese ancestry. The e-mail exchange included the following statements:

[] DoMinh: This is the award they give at the Denver, Colorado VARO.[8]

[] Hancock: The sign will say one chicken wing for you, 200 for me when the next boss lady arrives.

---

[8]"VARO" stands for "Veterans Affairs Regional Office." Deloach v. Shinseki, 704 F.3d 1370, 1372-73 (Fed. Cir. 2013).

- 8 -

[] DoMinh: ... or if G-POT become acting "Executive in Charge."

[] Hancock: Fat t[***] shouldn't manage a KFC for God's sake.

[] DoMinh: Here's another I-wish-it-were-true dream award.

[] Markey: How do you keep doing these?  On the paint thing?  Or at home?

[] DoMinh: Home.  Put the kid to sleep yesterday night and killed time f[***]ing around with the latest grip and grin photo I got of me and Terry (two years after the fact).

[] Markey: hilarious.

(Ellipsis in original).

On September 11, 2013, Hancock, Markey, and DoMinh commented on a photograph of different employees of the Board.  Markey and Hancock participated in the following e-mail exchange commenting on the photograph:

[] Hancock: Who's the chick beside A[.[9]] Crazy in the top right pic; not the terrorist.

[] DoMinh: V[.] B[.]: BVA attorney 1995-97.  I actually got introduced to Markey through her.

[] Hancock: Like to have my pee pee introduced to her va jay jay.

[] Markey: No — pic is much better than how she looked in person.

On the same date, e-mails also included the following statements:

[] DoMinh: By the way, I just taught a BVA 101 class with A[.] S[.] as my wingman for the first time.  She used to write for Markey. She is a sharp attorney and a pretty driven kid who looks like she's trying hard to make a mark at the BVA.  I recall Markey saying at one time during her novitiate phase as a BVA newbie that that c[**]t G-POT kind of had a hard-on for her.

---

[9]To protect the privacy of other employees of the Board, we refer to them by their initials.

I can't understand why. A[.] is a good kid. What made G-POT decide to f[***] with her?

[] Markey: When that 30 day thing came out of nowhere, A[.] had a case on the 30 day list, and K[.] berated her for over a week about it...she was a total b[****] to her.

[] DoMinh: Well that explains why during BVA 101 A[.] was particularly emphatic in her presentation about timeliness and the "30-day rule." She is still traumatized by G-POT rolling on her out of the blue like that.

[] Hancock: Previously administered abuse can take awhile to leave. Sometimes never completely. Meanwhile, looked her up in the yearbook. Nice DSL's.

[] DoMinh: You are in particularly randy mood today, Charles. Must've been a long cruise, huh, sailor?

[] Hancock: Randy is too gay a word to use here.

[] Markey: Nothings too gay for BD

[] DoMinh: said Jim, his voice muffled by the closet he is in.

(Ellipsis in original). The hearing judge found that "DSLs" stood for "d[***-]sucking lips."

On September 19, 2013, Markey e-mailed Hancock, Chiappetta, DoMinh, and Prichard a news article regarding an employee of the Frederick County Sheriff's Office who had been suspended. Markey had edited the article by adding the following paragraph, which indicated that Hancock had supported the suspended employee:

Some of his supporters — to include Chuck Hancock of Urbana — came to Thursday's hearing and got into a heated debate with an opponent. The opponent, a fast food working, basketball type playing man, indicated that such talk just wasn't cool. He left, timidly, when 11 people causally tossed ropes at him.

The hearing judge found that Markey used the phrase "fast food working, basketball type playing man" as a reference to African Americans, and that Markey's use of the term "tossed ropes" was a reference to the Ku Klux Klan's use of ropes to lynch African Americans.

On January 30, 2014, an e-mail exchange included the following statements:

[] Markey: Meanwhile, I just saw BD leave for the evening.  What, no nonpaid OT[10] tonight??

[] Hancock: Insane.

[] Markey: Ewok stayed later than him — I saw him leaving a few minutes later.  WTF?[11]

[] Hancock: Maybe a clandestine bj meeting has been arranged.

[] Markey: You're on fire today Chuckles!!!

[] Hancock: I clearly am filled with hate.  Need to stop.

[] Markey: No!!  actually keeps it sane here.

The hearing judge found that Markey used the term "Ewok" as a reference to Ewoks, the teddy-bear-like creatures from the *Star Wars* franchise, and that he used the term to mock a Veterans Law Judge.  The hearing judge found that the term "bj" was a reference to fellatio.

On March 26, 2014, an e-mail exchange consisted of the following:

[] DoMinh: Nothing makes my day more than seeing a beachfeet selfie from a lazy Chief.  Makes me want to punch out a nun.

---

[10]"OT" stands for "overtime[.]"  Clark v. Champion Nat'l Sec., Inc., 952 F.3d 570, 589 (5th Cir. 2020).

[11]"WTF" stands for "'what the f[***].'"  State v. Ravi, 147 A.3d 455, 461 & n.9 (N.J. Super. App. Div. 2016).

[] Prichard: At least she was merciful enough not to show the rest of herself

[] DoMinh: Few things are more hurt-inducing than seeing her astride that mechanical bull with the only thing keeping me from seeing straight up her too-short-for-her-age skirt into her gash was the fortunate placement of angle and shadow.

[] Prichard: They started out using a real bull but it got tired.

[] DoMinh: In G-POT's case, the real bull didn't last long because she ATE it.

[] Hancock: And threw the bones at white people.

In addition to the e-mails above, on August 28, 2014, Hancock sent an e-mail referring to a woman Chief Veterans Law Judge as follows: "Thought of her on the train this morning when I read this sentence in a book I'm reading. True. Here's the sentence: 'you're so fat your c[**]t probably turns inside out when you sit down.'"

In 2015, during an unrelated investigation, the Veterans Affairs Office of Inspector General discovered the e-mails and began investigating Markey, Hancock, Chiappetta, DoMinh, and Prichard. On December 1, 2015, the Department issued a Notice of Proposed Action, informing Markey that the Department sought to remove him from his position. The Department filed a complaint against Markey with the United States Merit Systems Protection Board, alleging conduct unbecoming of a Veterans Law Judge and misuse of government resources. Markey filed a response, admitting that he had participated in the e-mails, but denying that his conduct constituted good cause for his removal. The United States Merit Systems Protection Board conducted a hearing, and on November 9, 2017, issued an opinion, finding good cause for Markey's removal from federal service. The

Department terminated Markey.

Because Hancock was an at-will employee, he was not entitled to the United States Merit Systems Protection Board's process. On January 31, 2016, Hancock voluntarily retired. Afterward, the Social Security Administration hired Hancock with full knowledge of his participation in the e-mails that led to his departure from the Board. Hancock later resigned from the Social Security Administration to spend more time with his son, who according to the hearing judge, is a person with a disability. The hearing judge noted that, at the time of the hearing, Hancock worked as a substitute teacher, and volunteered assisting disadvantaged people and people experiencing homelessness.

The hearing judge found that Markey's and Hancock's misconduct was aggravated by substantial experience in the practice of law and a pattern of misconduct. The hearing judge found that Markey's misconduct was also aggravated by a refusal to acknowledge the wrongful nature of the conduct. In support of that finding, the hearing judge observed that "Markey was polite and otherwise appropriate with the [hearing judge,] and admitted [] the underlying facts of this matter." That said, the hearing judge stated that, although Markey was "not dismissive, he gave the impression that he was resigned to the fact that the Courts were going to do what they were going to do[,] regardless what he may present." The hearing judge pointed out that, in a letter to Bar Counsel, Markey stated: "I hope [that] the [Attorney Grievance] Commission will not take further action, but[,] if so, I am in no position to fight it." The hearing judge concluded that "Markey does not fully appreciate the seriousness of his actions and how they interfered with the administration of justice."

The hearing judge found that Markey's and Hancock's misconduct was mitigated

by a lack of prior attorney discipline, cooperation with Bar Counsel's and the Office of Inspector General's investigations, and the imposition of other sanctions in the form of Markey and Hancock losing their jobs as a result of the e-mails.[12] The hearing judge observed that, although in his Answer to the Petition for Disciplinary or Remedial Action, Markey asserted that he was remorseful and had "'good moral and ethical character[,]'" at the evidentiary hearing, Markey did not offer evidence of any mitigating factors.

The hearing judge found that Hancock's misconduct was mitigated by remorse and good character and reputation. The hearing judge pointed out that, at the evidentiary hearing, Hancock testified that he was remorseful, that he felt "terrible" that his e-mails "may have hurt people[,]" and "that many of his comments in the e[-]mails were both inappropriate and offensive." The hearing judge found that Hancock's expression of remorse was sincere. The hearing judge noted that, at the evidentiary hearing, Hancock called two character witnesses, each of whom had served as a Veterans Law Judge for decades, and had worked with Hancock on several matters. The character witnesses testified that they had read Hancock's e-mails, and did not believe that the e-mails were representative of his character. One of the character witnesses testified that Hancock had treated her with respect, that she had never seen him act inappropriately with anyone else, and that she would have no reservations about working with him again. The hearing judge found that there were numerous letters of support that corroborated the testimony of the

---

[12]As to Hancock, the hearing judge acknowledged that Hancock "resigned" from his position, but the hearing judge "accept[ed] that [Hancock] lost his employment due to his participation and statements made in the e[-]mails."

character witnesses.

**STANDARD OF REVIEW**

Where no party excepts to any of the hearing judge's findings of fact, we "treat the findings of fact as established[.]" Md. R. 19-741(b)(2)(A).[13] In an attorney discipline proceeding, this Court reviews without deference a hearing judge's conclusions of law, <u>see</u> Md. R. 19-741(b)(1), and determines whether clear and convincing evidence establishes that a lawyer violated an MLRPC, <u>see</u> Md. R. 19-727(c).

**DISCUSSION**

**(A) Conclusions of Law**

None of the parties excepts to the hearing judge's conclusions of law, all of which we uphold.

**MLRPC 8.4(d) (Conduct That Is Prejudicial to the Administration of Justice)**

"It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice[.]" MLRPC 8.4(d).

According to the hearing judge, Markey and Hancock contended that the comments in their e-mails did not violate MLRPC 8.4(d) because the comments were intended to be humorous, and were spread in a small circle of people, without the expectation that the comments would ever be shared outside of the small group, *i.e.*, the comments were private and were not intended to become public. The hearing judge found that Markey and Hancock made "derogatory statements about Hispanic, Asian, African American, and gay

---

[13]Neither Bar Counsel, Markey, nor Hancock excepts to any of the hearing judge's findings of fact.

- 15 -

men[,]" and women. The hearing judge determined that the e-mails were related to the practice of law and violated MLRPC 8.4(d). We conclude that the hearing judge's determinations are supported by clear and convincing evidence.

"[W]here . . . a lawyer engages in conduct that is related to the practice of law[,]" the lawyer violates MLRPC 8.4(d) if the lawyer's conduct "would negatively impact [the] perception of the legal profession" of "a reasonable member of the public[.]" Attorney Grievance Comm'n v. Basinger, 441 Md. 703, 720, 109 A.3d 1165, 1175 (2015) (cleaned up). Where a lawyer engages in "purely private conduct—*i.e.*, conduct that is entirely unrelated to the practice of law—" the lawyer violates MLRPC 8.4(d) "if the lawyer's conduct is criminal or so egregious as to make the harm, or potential harm, flowing from it patent." Attorney Grievance Comm'n v. Paul, 459 Md. 526, 547-48, 187 A.3d 625, 637 (2018) (cleaned up).

In Attorney Grievance Comm'n v. Link, 380 Md. 405, 428-29, 844 A.2d 1197, 1211-12 (2004), this Court explained that conduct that impacts the image or perception of the court or the legal profession or that engenders disrespect for the court and the profession may violate MLRPC 8.4(d). We recognized that the phrase prejudicial to the administration of justice had been interpreted to include conduct that a lawyer engages in outside of the legal profession. See id. at 427, 844 A.2d at 1210. It is clear from the discussion in Link, id. at 428-29, 844 A.2d at 1211-12, however, that purely private conduct refers to conduct that is unrelated to the practice of law, *e.g.*, social interactions between a lawyer and a non-lawyer, rather than conduct that is unknown by the public.

In Link, id. at 428-29, 408-13, 844 A.2d at 1211-12, 1199-1202, we held that a

lawyer's conduct was "purely private[,]" and that the lawyer did not violate MLRPC 8.4(d), where the lawyer engaged in a verbal altercation with two employees of the Motor Vehicle Administration. The lawyer was "rude, boorish, insensitive, oppressive[,] and certainly insulting[.]" Id. at 428, 844 A.2d at 1211. This Court determined that the lawyer's conduct was unrelated to the practice of law because it did not occur "during the course of litigation or court proceedings[,]" id. at 426, 844 A.2d at 1210, and because, "[a]lthough [the lawyer] was representing a client at the time of the incident, that fact was not readily apparent or sought to be emphasized[; i]ndeed, the [lawyer] resisted informing the [employee who later filed a complaint against him] that he was a lawyer[,]" id. at 428, 844 A.2d at 1211. Applying the "patent harm" test, this Court concluded that the lawyer did not violate MLRPC 8.4(d) because his conduct was "neither criminal nor conduct of the kind that the harm or potential harm flowing from it [was] patent[.]" Id. at 429, 844 A.2d at 1212.

In Basinger, 441 Md. at 720, 714, 109 A.3d at 1175, 1171, this Court held that a lawyer's conduct was related to the practice of law where the lawyer wrote letters to his sister-in-law, who was his client, and described his sister-in-law as, among other things, "A TRUE C [* *]T" who had "finally f[* * *]ed up one time too many"; and as "a reprehensible human being" with "worthless progeny." (Alterations in original).[14] In Basinger, id. at 707, 109 A.3d at 1167, the lawyer and his sister-in-law had entered into an attorney-client relationship in connection with her grandson's death during a motor vehicle

---

[14]In Basinger, 441 Md. at 718, 109 A.3d at 1174, this Court explained "that, in Link, by 'private,' this Court meant 'unrelated to the practice of law[,]'" as opposed to "'not known or intended to be known publicly.'"

accident. Within a month, the sister-in-law mailed an insurance company a letter in which she denied retaining the lawyer. See id. at 707-08, 109 A.3d at 1167. As a result, the lawyer sent his sister-in-law three letters containing disparaging remarks. See id. at 708, 109 A.3d at 1167-68.

This Court determined that the lawyer's "statements were made at least partially in his capacity as [a] lawyer" because the lawyer's letters were on his firm's letterhead and had headings that referenced the sister-in-law's grandson's estate, the "purpose in mailing the first letter was to formally acknowledge the representation's termination[,]" and the letters included information regarding his actions on the client's behalf. Id. at 713, 109 A.3d at 1171. Applying the "reasonable member of the public" test, this Court held that the lawyer violated MLRPC 8.4(d) because his "conduct—in his capacity as [the sister-in-law]'s lawyer, putting into letters numerous insults (including the obscene, sexist word 'c[**]t') that were aimed at the letters' recipient []—would negatively impact a reasonable member of the public's perception of the legal profession." Id. at 720, 109 A.3d at 1175 (second alteration in original).

Here, applying the reasonable member of the public test, the hearing judge concluded that "the insulting[,] demeaning language" that Markey and Hancock used in the e-mails would "undoubtedly bring[] the legal profession into disrepute in the eyes of a reasonable member of the public." We concur with the hearing judge's determination.

The hearing judge concluded that, in taking the position that the e-mails did not violate MLRPC 8.4(d) because there was no expectation that the e-mails would be shared outside of their group, Hancock misinterpreted this Court's holding in Link, as had the

lawyer in <u>Basinger</u>.  The hearing judge pointed out that the term "private" in <u>Link</u> meant unrelated to the practice of law, not undisclosed to or unknown by the public.  As the hearing judge determined, Markey's and Hancock's conduct was related to the practice of law.  When they made the statements in question, Markey and Hancock were a Veterans Law Judge and an Attorney-Advisor of the Board, respectively.  By definition, the Board— *i.e.*, the Board of Veterans' Appeals—performs legal work.  Both of Markey's and Hancock's positions were law-related and could be performed only by lawyers.  Markey's main job duties were to conduct hearings and issue opinions regarding appeals of decisions concerning veterans' claims for benefits.  Hancock's main job duty was to assist Veterans Law Judges with drafting opinions.  Markey and Hancock made their statements using their Department e-mail addresses, and, as the hearing judge observed, mostly during work hours.  The hearing judge found that, although Markey's and Hancock's statements did not directly pertain to a particular veteran or a particular appeal that was before the Board, in their statements, Markey and Hancock repeatedly referred to Board colleagues and Board-related matters.

For example, a review of the e-mail exchanges reveals that, on September 11, 2013, Markey discussed a change in rules at the Department and that a woman (an African American Chief Veterans Law Judge), whom he referred to as "a total b[****,]" berated another woman (a Board employee) about having "a case on the 30[-]day list[.]"  Hancock responded concerning the woman who had the case on the 30-day list, that he had looked her up in the yearbook and she had "[n]ice [d***-sucking lip]s."  In an e-mail exchange on January 30, 2014, Markey observed that another Board employee was leaving for the

evening and suggested that the employee would not be getting "nonpaid OT[.]"  Markey and Hancock discussed the timeframe that another employee left the office and the reason why.  In an e-mail exchange on August 28, 2013, discussing an award that DoMinh received at a Veterans Affairs Regional Office, Hancock stated: "The sign will say one chicken wing for you, 200 for me when the next boss lady arrives."

The purpose of the Board is to conduct hearings and determine appeals of claims by veterans for compensation.  All five of the participants in the e-mail chain were lawyers, and most of the Board colleagues to whom Markey and Hancock referred in the e-mails were also lawyers.  One person was an African American woman Chief Veterans Law Judge about whom Markey and Hancock repeatedly made extremely disparaging remarks.  Another person was a Board colleague to whom Markey referred in stating that the Chief Veterans Law Judge "was a total b[****] to her[,]" and who, Hancock said, had "nice [d***-sucking lip]s."  Another person was a woman who was a Board colleague about whom Hancock stated: "Like to have my pee pee introduced to her va jay jay[,]" and about whom Markey stated: "No — pic is much better than how she looked in person."  There was a Board colleague who, Hancock said, belonged to a "Forum of Gayness."  And Markey referred to another Veterans Law Judge as "Ewok[.]"  Markey and Hancock held positions of authority with the Board and used their federal government e-mail accounts during work hours to make offensive and derogatory remarks in e-mails that discussed Board-related matters and were about other Board colleagues who were also in positions of authority with the Board. Overall, Markey and Hancock made demeaning remarks about their colleagues and work, during times when they were supposed to be performing the

work of the Board and made the demeaning remarks using resources provided to them by the federal government to do the Board's legal work. Under these circumstances, it would be difficult, if not impossible, to conclude that the conduct at issue was not related to the practice of law.

Because Markey's and Hancock's actions were related to the practice of law, the reasonable member of the public test applies. See Basinger, 441 Md. at 720, 109 A.3d at 1175. The inappropriate and offensive remarks in the e-mail chains would certainly negatively impact the perception of the legal profession of a "reasonable member of the public[.]" Id. at 720, 109 A.3d at 1175. Any reasonable member of the public's perception of the legal profession would be negatively affected upon learning that Markey and Hancock, a Veterans Law Judge and an Attorney-Advisor, used their Department e-mail addresses during work hours to repeatedly send such offensive e-mails about their colleagues in the legal profession over such a long period of time. The remarks not only demonstrated little regard for others who the Department employed in legal positions, but also evidenced little awareness of the professional trust and responsibility given to Markey and Hancock by the Department in their respective roles. A reasonable member of the public would not expect a Veterans Law Judge and Attorney-Advisor of the Board to conduct themselves in such an unprofessional manner in the workplace.

This case is distinguishable from Link, 380 Md. at 428, 411, 844 A.2d at 1211, 1201, in which the lawyer's conduct was unrelated to the practice of law because he was not acting as a lawyer when he got into a verbal altercation at an office of the Motor Vehicle Administration—which is open to the general public—and, during the altercation, the

lawyer resisted advising the complainant that he was an attorney. By contrast, here, Markey and Hancock sent their e-mails mostly during work hours at their workplace (*i.e.*, the Board), using Department e-mail addresses, and talked about their colleagues and Board-related matters. That Markey and Hancock sent the e-mails using their Department e-mail addresses is significant, because, by definition, the e-mail addresses were provided to them by the Department for use in their work in the legal profession.

As the hearing judge correctly explained, Markey's and Hancock's contention that the e-mails were not intended to be publicized lacked merit not only because a lawyer's conduct need not be publicly known to constitute a violation of MLRPC 8.4(d), but also because it would have been unreasonable for Markey and Hancock to expect that their remarks would not become publicly known. Under the Freedom of Information Act, 5 U.S.C. § 552, records of the federal government are generally available to members of the public on request, see 5 U.S.C. § 552(a), subject to certain exemptions, see 5 U.S.C. § 552(b). As the hearing judge rightly observed, Markey and Hancock did not identify any exemption that would apply to their e-mails. Additionally, where, as here, a federal employee sends an e-mail using a government e-mail address, that e-mail is the property of the federal government, not the federal employee. See, e.g., United States v. Story Cty., Iowa, 28 F. Supp. 3d 861, 877 (S.D. Iowa 2014). Simply put, e-mails from federal government e-mail addresses can never be presumed to remain private—whether from federal employees to federal employee recipients or to members of the general public.

Additionally, as the hearing judge observed, regardless of Markey's and Hancock's intentions, their e-mails did not remain private. The e-mails were discovered by the

Veterans Affairs Office of Inspector General, and subsequently gave rise to an opinion of the United States Merit Systems Protection Board. In that opinion, which the hearing judge admitted into evidence, the United States Merit Systems Protection Board observed that the e-mail chain was the subject of a government watchdog's blog post and articles by multiple news outlets, including *The Wall Street Journal*.[15] And, of course, the e-mail chain came to Bar Counsel's attention, and resulted in this attorney discipline proceeding. Plainly, any contention that Markey's and Hancock's conduct fit the definition of purely private conduct is wrong, even if purely private meant that the conduct was not to be publicly known, which it does not.

In sum, the hearing judge rejected the argument that the e-mails were "purely private" and determined that Markey's and Hancock's conduct was "related to the practice of law[.]" The hearing judge concluded that Markey's and Hancock's conduct would negatively impact the perception of the legal profession of a reasonable member of the public. The hearing judge stated:

> Markey and Hancock participated in numerous derogatory statements about Hispanic, Asian, African American, and gay men. Using an objective

---

[15]Indeed, the opinion of the United States Merit Systems Protection Board includes an excerpt from the blog, which stated:

> If I were a veteran and learned that my [Board] denial may have been decided by an individual who holds racist or sexist bias, I'd sure be speaking with a veterans law attorney. This is one more embarrassing event for your Department of Veterans Affairs. Only at the VA will you find adult professionals who think it's OK to distribute racist or sexist e[-]mail message[s] to others.

This excerpt shows that information about the e-mails became publicly known and commented upon.

standard required by the law, this Court finds the insulting demeaning language used by them in the e[-]mails undoubtedly brings the legal profession into disrepute in the eyes of a reasonable member of the public.

The hearing judge's conclusions are more than amply supported by clear and convincing evidence.

## MLRPC 8.4(e) (Bias or Prejudice)

MLRPC 8.4(e) stated:

It is professional misconduct for a lawyer to . . . knowingly manifest[,] by words or conduct[,] when acting in a professional capacity[,] bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation[,] or socioeconomic status when such action is prejudicial to the administration of justice, provided, however, that legitimate advocacy is not a violation of [MLRPC 8.4(e).]

As MLRPC 8.4(e)'s plain language makes clear, a violation of the provision is comprised of four components. To violate MLRPC 8.4(e), a lawyer must: (1) when acting in a professional capacity, (2) knowingly manifest by words or conduct bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation, or socioeconomic status, (3) when such action is prejudicial to the administration of justice, and (4) not legitimate advocacy. To put the matter into criminal law terms, a violation of MLRPC 8.4(d) would be considered a lesser-included offense of a violation of MLRPC 8.4(e), as the latter includes all of the components of the former, plus additional ones.

Comment 4 to MLRPC 8.4 stated in pertinent part:

Section (e) of this Rule reflects the premise that a commitment to equal justice under the law lies at the very heart of the legal system. As a result, even when not otherwise unlawful, a lawyer who, while acting in a professional capacity, engages in the conduct described in section (e) of this Rule and by so doing prejudices the administration of justice commits a particularly egregious type of discrimination. Such conduct manifests a lack

of character required of members of the legal profession.

Here, the hearing judge determined that, as to Markey and Hancock, Bar Counsel had proven, by clear and convincing evidence, a violation of MLRPC 8.4(e). The hearing judge concluded that Markey's and Hancock's many inappropriate and offensive remarks in e-mails clearly constituted examples of knowingly manifesting bias and prejudice based upon race, sex, sexual orientation, national origin, and socioeconomic status. The hearing judge determined that Markey and Hancock were acting in a professional capacity when they made the statements at issue, and, as discussed above, their conduct was related to the practice of law and violated MLRPC 8.4(d), *i.e.*, was prejudicial to the administration of justice. The hearing judge concluded that Markey's and Hancock's e-mails clearly served no legitimate advocacy. We agree with all of the above.

This is only the second case in which this Court has determined whether a lawyer violated MLRPC 8.4(e). The first was Attorney Grievance Comm'n v. Sanderson, 465 Md. 1, 65, 25-26, 213 A.3d 122, 159, 136 (2019), in which this Court held that a lawyer violated MLRPC 8.4(e) by approaching a social worker who had just testified at a hearing in a Child in Need of Assistance case and calling her a "baby-snatching b[****]." This Court determined that the lawyer was acting within his professional capacity at the time because of the temporal proximity between the hearing and the remark. See id. at 65, 213 A.3d at 159. This Court concluded that, based on the language alone, the lawyer knowingly manifested bias or prejudice based upon sex. See id. at 65, 213 A.3d at 159. Both MLRPC 8.4(e)'s plain language and this Court's holding in Sanderson support the conclusion that, in this case, the hearing judge's determination is supported by clear and convincing

evidence.

The hearing judge's conclusion that, with the statements in the e-mail exchanges, Markey and Hancock knowingly manifested bias or prejudice based upon race, sex, sexual orientation, national origin, and socioeconomic status is supported by clear and convincing evidence. While participating in the e-mail chain, Markey demonstrated bias or prejudice based on race when, in response to a photograph of Hancock's son's all-white Little League team, Markey asked "where are the white sheets?" and stated "'Bon fire' after every victory[,]" referencing the Ku Klux Klan. In another e-mail, Markey made up a story about a "fast food working, basketball type playing man" at whom "people causally tossed ropes[,]" casually and callously referring to the Ku Klux Klan's lynchings of African Americans.

Markey demonstrated bias or prejudice based on sex by calling an African American woman Chief Veterans Law Judge as "a total b[****,]" and by referring to another woman who was a colleague as "baby t[,]" which was short for "baby talk," a disparaging reference to that colleague's tone of voice. In one e-mail exchange in which participants were commenting on a photograph, Markey commented of a woman colleague that the "pic is much better than how she looked in person." As to statements demonstrating bias or prejudice based upon sexual orientation, the hearing judge concluded that Markey's and Hancock's "statements included multiple homosexual references and slurs to describe other male [] employees." In one e-mail, Markey stated that "[n]othing[']s too gay for" one of the e-mail participants. In another e-mail, Markey indicated that the same e-mail participant had gone to a gay bar and stated that the bar had "creepy[-]looking clientele[.]"

As to bias or prejudice based on national origin, in one e-mail exchange, after one of the participants appeared to imitate a Spanish accent, Markey stated "[p]erhaps we'll go out for a taco lunch or something[,]" making a joke about a Deputy Vice Chairman's nationality.

Likewise, in the e-mails, Hancock made numerous statements demonstrating bias or prejudice based upon race, sex, sexual orientation, national origin, and socioeconomic status. Specifically, as to bias or prejudice based on race, Hancock referred to an African American woman Chief Veterans Law Judge as "G-Pot" (which was short for "Ghetto Hippopotamus"), and in response to DoMinh's remark that the Chief Veterans Law Judge had eaten a "bull," Hancock responded that she had "thr[o]w[n] the bones at white people." In an e-mail which included a photograph of Hancock's son's all-white Little League team, Hancock stated that there was not a "Charo, Adrian, or BD in the bunch." The hearing judge found that "Charo" was "code for someone of Spanish descent[,]" "Adrian" was "code for African Americans[,]" and "BD" referred to DoMinh, "who is Asian."

Concerning bias or prejudice based on sex, Hancock stated that the African American woman Chief Veterans Law Judge was "a despicable impersonation of a human woman, who ought to [have] her cervix yanked out … and force[-]fed to her." Referring to a woman Chief Veterans Law Judge, Hancock stated she was "so fat [that her] c[**]t probably turns inside out when [she] sit[s] down." In one e-mail, Hancock stated that he had looked a colleague up in the yearbook and that she had "[n]ice DSL's" (which stood for "d[***-]sucking lips"). Hancock said of another colleague who was a woman that he would "[l]ike to have [his] pee pee introduced to her va jay jay," and referred to yet another

colleague as "A[.] Crazy[.]"

Demonstrating bias or prejudice based on sexual orientation, in an e-mail, Hancock stated that two male colleagues "gobble[d]" another male individual's "j[***]" and stated that two male individuals belonged to a male colleague's "Forum of Gayness." In yet another e-mail, Hancock stated that "a clandestine bj meeting ha[d] been arranged" by a male colleague, referring to fellatio, and when Markey complimented him on the remark, Hancock responded: "I clearly am filled with hate. Need to stop." In response to a question about whether an employee leaked the Board e-mail archive to Julian Assange, Hancock responded: "No, but he like to leak some semen his way." In the same e-mail exchange, Hancock asked: "Can we talk about gay stuff on the VA e[-]mail system?" In another e-mail exchange, in which one participant used the word "randy," Hancock retorted that "[r]andy is too gay a word to use here."

Hancock made statements demonstrating bias or prejudice based on national origin or race when he referred to a colleague as a "terrorist" and when he used derogatory terms to observe that the photograph of his son's all-white Little League team did not contain people of certain ethnic backgrounds. The hearing judge concluded that both Markey and Hancock participated in multiple e-mail exchanges that manifested bias and prejudice based on socioeconomic status. For example, in one exchange, an e-mail participant (DoMinh) referred to the location of a Veterans Affairs medical center as being in "the city of Giant Lard A[**] Kentucky Fried Chicken Eater, North Dakota." In another instance, as the hearing judge indicated, Hancock demonstrated bias or prejudice based on socioeconomic status when one e-mail participant suggested that the African American

- 28 -

woman Chief Veterans Law Judge might be promoted to an executive position and he responded that she was a "[f]at t[*** who] shouldn't manage a KFC for God's sake."

Without question, the remarks summarized above demonstrate that Markey and Hancock engaged in conduct that knowingly manifested bias or prejudice based upon race, sex, national origin, sexual orientation, and socioeconomic status. The hearing judge determined that Markey and Hancock "were acting in their professional capacity" when they made the comments at issue because they made the comments using Department e-mail addresses and they sent the e-mails "largely during work hours." Also, the hearing judge concluded that, although none of the e-mails involved a specific case, the e-mails were aimed at their Board colleagues, including employees and supervisors, and were generally about the work performed by the Board. The hearing judge also determined that the statements were prejudicial to the administration of justice and plainly not in support of legitimate advocacy. We fully agree. Clear and convincing evidence supports the hearing judge's conclusions.

## MLRPC 8.4(a) (Violating the MLRPC)

"It is professional misconduct for a lawyer to[] violate . . . the" MLRPC. MLRPC 8.4(a). The hearing judge's conclusion that Markey and Hancock violated MLRPC 8.4(a) is supported by clear and convincing evidence. As discussed above, Markey and Hancock violated MLRPC 8.4(d) and 8.4(e).

## (B) Sanction

Without specifying whether the sanction should be an indefinite or definite suspension, Bar Counsel recommends that we suspend Markey and Hancock from the

practice of law in Maryland. Hancock requests that we reprimand him. Markey has made no recommendation.

In Attorney Grievance Comm'n v. Slate, 457 Md. 610, 646-47, 180 A.3d 134, 155-56 (2018), this Court stated:

> This Court sanctions a lawyer not to punish the lawyer, but instead to protect the public and the public's confidence in the legal profession. This Court accomplishes these goals by: (1) deterring other lawyers from engaging in similar misconduct; and (2) suspending or disbarring a lawyer who is unfit to continue to practice law.
>
> In determining an appropriate sanction for a lawyer's misconduct, this Court considers: (1) the MLRPC that the lawyer violated; (2) the lawyer's mental state; (3) the injury that the lawyer's misconduct caused or could have caused; and (4) aggravating factors and/or mitigating factors.
>
> Aggravating factors include: (1) prior attorney discipline; (2) a dishonest or selfish motive; (3) a pattern of misconduct; (4) multiple violations of the MLRPC; (5) bad faith obstruction of the attorney discipline proceeding by intentionally failing to comply with rules or orders of the disciplinary agency; (6) submission of false evidence, false statements, or other deceptive practices during the attorney discipline proceeding; (7) a refusal to acknowledge the misconduct's wrongful nature; (8) the victim's vulnerability; (9) substantial experience in the practice of law; (10) indifference to making restitution or rectifying the misconduct's consequences; (11) illegal conduct, including that involving the use of controlled substances; and (12) likelihood of repetition of the misconduct.
>
> Mitigating factors include: (1) the absence of prior attorney discipline; (2) the absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith efforts to make restitution or to rectify the misconduct's consequences; (5) full and free disclosure to Bar Counsel or a cooperative attitude toward the attorney discipline proceeding; (6) inexperience in the practice of law; (7) character or reputation; (8) a physical disability; (9) a mental disability or chemical dependency, including alcoholism or drug abuse, where: (a) there is medical evidence that the lawyer is affected by a chemical dependency or mental disability; (b) the chemical dependency or mental disability caused the misconduct; (c) the lawyer's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful

- 30 -

rehabilitation; and (d) the recovery arrested the misconduct, and the misconduct's recurrence is unlikely; (10) delay in the attorney discipline proceeding; (11) the imposition of other penalties or sanctions; (12) remorse; (13) remoteness of prior violations of the MLRPC; and (14) unlikelihood of repetition of the misconduct.

(Cleaned up).

In assessing the appropriate sanction for Markey and Hancock, we consider that they violated MLRPC 8.4(d) and 8.4(e) by using Department e-mail addresses to make alarmingly inappropriate and offensive remarks about their colleagues that were both prejudicial to the administration of justice and evinced bias and prejudice on multiple grounds. In the context of concluding that Markey and Hancock violated MLRPC 8.4(d), the hearing judge found that "[t]he extremely offensive comments in [their] e[-]mails were deliberate[.]" All of the circumstances that the hearing judge found point to the conclusion that Markey and Hancock made the inappropriate and offensive remarks intentionally over a lengthy period of time. These were not spontaneous, impulsive, or out-of-character remarks or isolated incidents. Markey's and Hancock's misconduct clearly had the potential to undermine the work of the Board and the public's confidence in that work, as well as damage the public's perception of the legal profession, the Board, the Department, and the federal government at large.

The hearing judge found that the aggravating factors of substantial experience in the practice of law and a pattern of misconduct applied to both Markey and Hancock. The hearing judge found that the additional aggravating factor of a refusal to acknowledge the wrongful nature of the misconduct applied to Markey. The record supports the hearing judge's findings by clear and convincing evidence. And, we discern one additional

- 31 -

aggravating factor that applies to both Markey and Hancock: multiple violations of the MLRPC.

The hearing judge found that the mitigating factors of a lack of prior attorney discipline, cooperation with Bar Counsel's and the Office of Inspector General's investigations, and the imposition of other sanctions in the form of loss of employment applied to both Markey and Hancock. We accept the hearing judge's determinations.[16]

The hearing judge found that additional mitigating factors—remorse[17] and good character and reputation[18]—applied to Hancock. We do not disturb the hearing judge's findings of the additional mitigating factors as to Hancock.

---

[16]We are aware that Hancock voluntarily retired from the Board. Although Hancock leaving the Board was voluntary and he obtained employment with the Social Security Administration, the hearing judge accepted that Hancock's loss of employment was due to the e-mail exchanges. We will not disturb the hearing judge's finding.

[17]In the document in which he requests a reprimand, Hancock concedes that he violated MLRPC 8.4(d), 8.4(e), and 8.4(a), but states: "I candidly admit that, to a reader of some of these messages, who was not aware of the context of the messages, an objective reading could result in the reader forming a negative image and perception of the legal profession." This acknowledgement of wrongdoing is extremely qualified, and seems to incorrectly suggest that only "some of" Hancock's remarks were wrongful, and/or that his offensive statements may have seemed less egregious in "context[.]" That said, we cannot determine that the hearing judge clearly erred in finding credible Hancock's testimony that he was remorseful.

[18]Although Hancock presented the testimony of two witnesses who attested to his good character and provided character letters, according to comment 4 to MLRPC 8.4, a violation of MLRPC 8.4(e) in and of itself demonstrates a lack of character. Comment 4 states that a lawyer who violates MLRPC 8.4(e) "commits a particularly egregious type of discrimination. Such conduct manifests a lack of character required of members of the legal profession." Although the comment to MLRPC 8.4 states that the conduct demonstrates a lack of character and the numerous e-mail exchanges between Markey and Hancock belie a finding of good character and reputation, given the evidence presented at the disciplinary hearing, we decline to conclude that the hearing judge's finding was clearly erroneous.

We conclude that the appropriate sanction for Markey's and Hancock's misconduct is an indefinite suspension for each from the practice of law in Maryland. Markey's and Hancock's remarks were egregious, were part of an approximately seven-year-long pattern, and were not stray, random, or isolated. Markey, Hancock, and the other participants in the e-mail chain referred to it as "the Forum of Hate," and referred to themselves as "members" of "the Forum of Hate." These circumstances establish that Markey and Hancock were making remarks that were intentionally offensive. The *modus operandi* of the group was for its members to regularly make deliberately offensive statements, and to praise each other for the statements. For example, after DoMinh made an offensive remark about an African American woman Chief Veterans Law Judge four days before Christmas 2012, Markey stated: "Good xmas hate gate[.]" Similarly, after Chiappetta, a Chief Veterans Law Judge, made a reference to the Ku Klux Klan, Hancock stated: "Nice management hate. Bout time!!"

Markey's and Hancock's statements demonstrating bias and prejudice speak for themselves and constitute abhorrent conduct without the need for any evidence that Markey and/or Hancock discriminated against a particular veteran in a case before the Board. Actual discrimination is not required to determine that Markey and Hancock glaringly violated MLRPC 8.4(e) when, acting in their professional capacities, they knowingly engaged in conduct demonstrating bias and prejudice that was prejudicial to the administration of justice and not in pursuit of legitimate advocacy. Comment 4 to MLRPC 8.4 explains that MLRPC 8.4(e) "reflects the premise that a commitment to equal justice under the law lies at the very heart of the legal system[,]" and that a violation "manifests a

- 33 -

lack of character required of members of the legal profession." Markey's and Hancock's many inappropriate and offensive statements were demeaning of many groups of people in our society, an affront to the dignity of the legal profession, and cannot be tolerated from any members of the Bar of Maryland—especially ones who occupy positions of public trust.

Markey's and Hancock's misconduct warrants the same sanction even though Markey was a Veterans Law Judge and Hancock was an Attorney-Advisor. To be sure, Markey occupied a higher position of trust than an Attorney-Advisor and as a Veterans Law Judge was responsible for fairly and impartially making decisions with respect to claims by veterans and Hancock as an Attorney-Advisor assisted Veterans Law Judges with drafting opinions and did not have decision-making authority. Regardless of their positions, however, Markey and Hancock equally participated in the e-mail exchanges and the applicable aggravating and mitigating factors do not compel different sanctions. Although Hancock has the additional mitigating factors of remorse and good character and reputation, and Markey has the additional aggravating factor of a refusal to acknowledge the wrongful nature of the misconduct, those differences are counterbalanced by the circumstance that Hancock's statements were particularly egregious and that we do not give great weight to Hancock's additional mitigating factors. As but one example of the egregiousness of his statements, Hancock called a Chief Veterans Law Judge a "Ghetto Hippopotamus" and "a despicable impersonation of a human woman, who ought to [have] her cervix yanked out of her . . . ." In other examples, Hancock referred to people of different ethnicities as "Charo," "Adrian," and "BD[,]" he stated that he wanted to perform

a sexual act with a woman colleague who was depicted in a photograph, and said that another woman colleague had "[n]ice DSL's." And these are just a few examples.

Although we decline to disturb the hearing judge's findings with respect to remorse and good character and reputation, those mitigating factors are of limited significance in assessing the appropriate sanction for Hancock's misconduct. Hancock's expression of remorse was qualified; he acknowledged that only some of his remarks were wrongful and insisted that his statements were less offensive when read in context. And, although Hancock presented evidence in the form of character witnesses and letters, the comment to MLRPC 8.4 indicates that conduct violating MLRPC 8.4(e) manifests a lack of character. Hancock's statements in the e-mails demonstrate a lack of character; and it could be taken that the support for and against the mitigating factor of good character and reputation is in equipoise.

Bar Counsel contends that this attorney discipline proceeding is similar to In re Kahn, 16 A.D.3d 7, 10, 8 (N.Y. App. Div. 2005), in which the Appellate Division of the Supreme Court of New York suspended for six months a lawyer who violated the New York rules of professional conduct that prohibited "conduct that adversely reflects on [one]'s fitness as a lawyer" and "undignified or discourteous conduct that is degrading to a tribunal[.]" For approximately thirteen years, the lawyer engaged in a pattern of making remarks that were inappropriate. See id. at 8-9. For example, the lawyer regularly offered round peppermint candies to opposing counsel who were women by asking: "Do you want to suck one of my b[***]s?" Id. at 9. Whenever opposing counsel indicated that the offer was offensive, the lawyer would respond: "If you're so damned refined[,] then why do you

understand?" Id. On one occasion, the lawyer referred to a woman who was opposing counsel as "pig vomit on [his] shoes." Id. On another occasion, when the same opposing counsel was about to enter a courtroom, the lawyer yelled: "Here is the elephant, she's coming in. Who wants tickets? Come see the show." Id. Additionally, the lawyer made improper remarks about a thirteen-year-old girl who was his client and who had been arrested for prostitution, and in another instance, invited a woman who was opposing counsel to guess a fourteen-year-old client's bra size. See id. In separate occurrences, a friend warned the lawyer that his remarks were inappropriate, and opposing counsel asked him to refrain from vulgarity, but the lawyer continued his pattern of making inappropriate remarks. See id. at 9-10.

In the attorney discipline proceeding, the lawyer requested a public censure, contending that his misconduct was mitigated by him cooperating with the Disciplinary Committee, beginning psychotherapy to address the problem, acknowledging his misconduct, and showing remorse by sending letters of apology after the disciplinary hearing. See id. at 8-9. In contrast, the Disciplinary Committee recommended a six-month suspension, contending that a public censure would have been appropriate for "a single outburst or incident[,]" but a suspension was warranted for the lawyer's "pattern of abusive behavior[.]" Id. at 8 (citations omitted).

The Court adopted the Disciplinary Committee's recommendation, explaining that the lawyer's "persistent behavior warrant[ed] more than a minimum sanction[.]" Id. at 9-10 (citations omitted). The Court observed that the lawyer's misconduct lasted for over a decade and did not involve isolated incidents. See id. at 8-9. The Court determined that

- 36 -

the lawyer's letters of apology did "little to ameliorate the harm inflicted by [his] abusive, vulgar[,] and demeaning comments, directed at female [opposing counsel] and young clients[] alike." Id. at 9.

We agree with Bar Counsel that, in certain respects, this attorney discipline proceeding is analogous to Kahn, but we conclude that the misconduct in this case is much more egregious. Like Kahn, Markey and Hancock engaged in a years-long pattern of regularly making remarks that were offensive or otherwise inappropriate, and that were "not limited to isolated incidents." Kahn, 16 A.D.3d at 8-9. Similar to Kahn making offensive remarks about a woman who was opposing counsel as she entered the courtroom, id. at 9, Markey and Hancock made offensive remarks in e-mails about an African American woman Chief Veterans Law Judge.[19] Just as Kahn asked women who were opposing counsel an inappropriate question laced with sexual innuendo, see id., Hancock spoke of women who were his colleagues in an inappropriate manner.[20] Although Kahn insulted woman in person rather than in e-mails to third parties, and Markey's and Hancock's offensive statements about women occurred in e-mails to others, the sentiment and disparagement of women is the same. The difference in the cases is that, while Kahn made inappropriate and offensive remarks to and about women, see id., Markey and

---

[19]Kahn stated "[h]ere is the elephant, she's coming in. Who wants tickets? Come see the show." Kahn, 16 A.D.3d at 9. Among other things, Markey referred to the African American woman Chief Veterans Law Judge as "a total b[****,]" and Hancock referred to her as a "Ghetto Hippopotamus[.]"

[20]Kahn stated "Do you want to suck one of my b[***]s?", Kahn, 16 A.D.3d at 9, and Hancock stated that a colleague had "nice [d***-sucking lip]s[,]" and with respect to another colleague that he would "[l]ike to have [his] pee pee introduced to her va jay jay."

Hancock made a wide variety of contemptible and extremely offensive remarks about multiple groups of people, including women. In addition to disparaging and demeaning women in the e-mail exchanges, Markey and Hancock used vitriol to display bias and prejudice against many different groups of people who were not targeted by Kahn. The hearing judge expressly found that Markey did not appreciate the seriousness of his misconduct. And, like Kahn's letters of apology, Hancock's expression of remorse by no means rehabilitates the harm of his wide-ranging degrading and vulgar statements. Like Kahn's long-running misconduct, Markey's and Hancock's misconduct was persistent and certainly warrants more than a reprimand and, indeed, a sanction longer than a six-month suspension. See id. at 9-10. On the whole, a comparison of this attorney discipline proceeding to Kahn persuades us that a more severe sanction—namely, an indefinite suspension—is warranted for Markey's and Hancock's misconduct. See id. at 10.[21] An indefinite suspension protects the public's confidence in the legal profession and deters similar misconduct by communicating that behavior of this type is simply not acceptable.

It is of no significance that, as Hancock emphasizes, his statements were never

---

[21]In the filing regarding the recommendation as to the appropriate sanction, Bar Counsel contends that Markey's and Hancock's misconduct is similar not only to that in Kahn, 16 A.D.3d 7, but also to the misconduct in Attorney Grievance Comm'n v. Marcalus, 442 Md. 197, 112 A.3d 375 (2015), in that the misconduct occurred over a protracted period of time. As Bar Counsel acknowledges, however, the misconduct in Marcalus is distinguishable. In Marcalus, id. at 200, 199, 112 A.3d at 376, this Court disbarred a lawyer who, among other misconduct, engaged in "sexting" with a female party in litigation in which he represented the opposing party. Significantly, the lawyer in Marcalus had been previously suspended from the practice of law twice. See id. at 210, 112 A.3d at 382. Because Marcalus involved a lawyer who had a history of prior attorney discipline, Marcalus does not provide guidance as to the appropriate sanction in this attorney discipline proceeding.

meant to be shared with anyone other than members of the FOH. In <u>Basinger</u>, 441 Md. at 718, 109 A.3d at 1174, this Court explained that with respect to MLRPC 8.4(d), it does not matter whether a lawyer's misconduct was "'not known or intended to be known publicly.'" Considering "whether other people knew of the lawyer's conduct . . . would lead to the absurd result that whether a lawyer violated MLRPC 8.4(d) would depend on . . . how much the lawyer's conduct was publicized." <u>Id.</u> at 716-17, 109 A.3d at 1173. This Court pointed out:

> Ultimately, it does not matter whether the lawyer's conduct was publicized before this Court considers the attorney discipline proceeding. By issuing an opinion that will become available to anyone with an internet connection, this Court will effectively inform the public of the lawyer's conduct. It would be ironic if we issued a publicly available opinion in which we recited the lawyer's conduct, then concluded that the lawyer's conduct could not have negatively impacted the public's perception of the legal profession because the public did not actually know of the lawyer's conduct.

<u>Id.</u> at 717 n.7, 109 A.3d at 1173 n.7.

We find no worth in Hancock's contention that, in light of <u>Basinger</u>, <u>id.</u> at 722, 109 A.3d at 1176, we should merely reprimand him. Both Markey's and Hancock's misconduct is far more egregious than Basinger's. Although Basinger made multiple offensive remarks, his insults were directed at one person and were limited to three letters that he sent over the course of four days. <u>See id.</u> at 708, 109 A.3d at 1167-68. By contrast, the e-mails in which Markey and Hancock participated spanned approximately seven years. Additionally, Markey and Hancock did not limit their expression of prejudice to one person, and instead demeaned and mocked a wide range of people in their e-mails. The hearing judge's opinion quotes ten different e-mail exchanges in which Markey and

Hancock made remarks demonstrating bias or prejudice based upon race, sex, national origin, sexual orientation, or socioeconomic status. These statements included not only the obscenity "c[**]t[,]" which the lawyer in Basinger used, id. at 708, 109 A.3d at 1168, but also a wide array of other inappropriate and offensive remarks. As repugnant as Basinger's remarks were, they pale in comparison with some of the statements that Markey and Hancock made in their e-mails. Basinger offers no support whatsoever for Hancock's request for a reprimand.

Reprimanding either Markey or Hancock would be inconsistent with our goals of "protect[ing] the public and the public's confidence in the legal profession [by] deterring other lawyers from engaging in similar misconduct[.]" Slate, 457 Md. at 646, 180 A.3d at 155 (citation omitted). This is the second attorney discipline proceeding in which this Court has concluded that a lawyer violated MLRPC 8.4(e)—and, in the first one, Sanderson, 465 Md. at 74-75, 213 A.3d at 165, there were several additional MLRPC violations that warranted disbarment. Sanderson does not provide guidance as to the appropriate sanction in an attorney discipline proceeding like this one, in which the lawyers have violated MLRPC 8.4(d), 8.4(e), and 8.4(a). We agree with Bar Counsel that there is no case in Maryland that is directly on point with respect to the appropriate sanction.

We are essentially writing on a blank slate, and what we decide in this attorney discipline proceeding will become precedent for the sanctions imposed for similar misconduct by lawyers in the future. If we were to reprimand either Markey or Hancock, we would effectively be communicating to members of the Bar of Maryland and the public that making these types of inappropriate and offensive remarks is not serious misconduct.

- 40 -

A reprimand or even a short suspension would beg the question of what, if any sanction, would be appropriate for a lawyer who violates MLRPC 8.4(e) by making a stray offensive comment, as opposed to many statements that are deliberate, egregious, and occur over a period of time. Markey's and Hancock's violations of MLRPC 8.4(e) were serious and flagrant, and warrant a sanction that makes clear to every Maryland lawyer and the public that such conduct is unacceptable. We must assure that lawyers do not evince bias or prejudice while acting in their professional capacities and that the principles of fairness and equal justice under the law are foremost in the legal profession.

For the above reasons, we indefinitely suspend Markey and Hancock from the practice of law in Maryland. Markey is currently decertified and temporarily suspended from the practice of law in Maryland as a result of his failures to pay an annual assessment to the Client Protection Fund, provide information regarding his federal Tax Identification Number, and file a Pro Bono Legal Service Report and an Interest on Lawyers Trust Accounts Report for the period from January 1, 2018, through June 30, 2019. Markey's indefinite suspension will take effect immediately. Although Hancock is not currently suspended from the practice of law in Maryland, he is in inactive/retired status, and his indefinite suspension will also take effect immediately.

**IT IS SO ORDERED; RESPONDENTS SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 19-709(d), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST JAMES ANDREW MARKEY AND CHARLES LEONARD HANCOCK.**

Circuit Court for Montgomery County
Case No. 468469-V
Argued: Oral argument waived/submitted on papers

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Docket AG No. 5

September Term, 2019

_____

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

JAMES ANDREW MARKEY AND
CHARLES LEONARD HANCOCK

_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

_____

Concurring Opinion by McDonald, J.

_____

Filed: June 26, 2020

I join the opinion of the Court in this case. I add a few words to emphasize the seriousness of this case in that it involves government attorneys – one an administrative judge. As the Majority Opinion outlines, the conduct involved email communications during the attorneys' employment over government information systems.

Every Maryland attorney takes an oath to "at all times demean myself fairly and honorably as an attorney" and to uphold the State and federal constitutions. Maryland Code, Business Occupations & Professions Article, §10-212. The lawyer's oath is not a rote formula recited solely to cross the threshold of bar admission, but a pledge for the duration of one's career. Those lawyers privileged to be in public service have a special obligation to exemplify those principles of fairness, probity, and adherence to constitutional values.

In the context of a disciplinary case involving a Deputy State's Attorney, this Court observed that the attorney was to be held to a higher standard of conduct due to his public position. *Attorney Grievance Comm'n v. McDonald*, 437 Md. 1, 46 (2014) (citing an American Bar Association publication that relates the disciplinary sanction to be imposed on a government attorney to the failure to maintain the public trust). While that case concerned a prosecutor, that norm applies to all government attorneys who exercise, or advise the exercise of, the sovereign powers of government – including those involved in the veterans' benefits system. *Cf. Hodge v. West*, 155 F.3d 1356, 1363 (Fed. Cir. 1998) (in the veterans' benefits system, "the importance of systemic fairness and the appearance of fairness carries great weight"). The conduct here was contrary to the lawyer's oath and

gave, at the least, the appearance that fairness and decency did not animate those charged with this important public service.

| ATTORNEY GRIEVANCE COMMISSION OF MARYLAND | * | IN THE |
|---|---|---|
| | * | COURT OF APPEALS |
| v. | * | OF MARYLAND |
| JAMES ANDREW MARKEY AND CHARLES LEONARD HANCOCK | * | Misc. Docket AG No. 5 |
| | * | September Term, 2019 |

## ORDER

Upon consideration of the Motion for Reconsideration of Effective Date of Sanction Imposed filed by Attorney Grievance Commission of Maryland, Petitioner, on July 16, 2020, and the lack of any response thereto, it is this 6th day of August, 2020,

**ORDERED**, by the Court of Appeals of Maryland, that the last two sentences of the last paragraph on page 41 of the opinion are replaced with the following sentences:

> Markey's indefinite suspension will take effect immediately. Although Hancock is not currently suspended from the practice of law in Maryland, he is in inactive/retired status, and his indefinite suspension will also take effect immediately.

/s/ Mary Ellen Barbera
Chief Judge