Attorney Grievance Comm'n v. Carl Stephen Basinger, Misc. Docket AG No. 30, September Term, 2013

**ATTORNEY DISCIPLINE – SANCTIONS – REPRIMAND –** Court of Appeals reprimanded lawyer who mailed to his client letters containing egregiously unprofessional language in which lawyer called his client, among other things, "A TRUE C[**]T[.]" Such conduct violated Maryland Lawyers' Rule of Professional Conduct 8.4(d) (Conduct that is Prejudicial to the Administration of Justice).

Circuit Court for Baltimore County
Case No. 03-C-13-008954

Argued: January 13, 2015

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Docket AG No. 30

September Term, 2013

_____

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

CARL STEPHEN BASINGER

_____

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

_____

Opinion by Watts, J.

_____

Filed: February 23, 2015

This attorney discipline proceeding involves a lawyer who mailed to his client letters containing egregiously unprofessional language in which the lawyer called his client, among other things, "A TRUE C[**]T[.]"

Carl Stephen Basinger ("Basinger"), Respondent, a member of the Bar of Maryland, and his sister-in-law, Rosina Keys ("Keys"), entered into an attorney-client relationship. After learning that Keys had denied that she had retained him, Basinger mailed to Keys letters in which he called Keys "A TRUE C[**]T" who had "finally f[***]ed up one time too many"; called Keys "a reprehensible human being" with "worthless progeny" and a "pathetic and dysfunctional world"; accused Keys of being lazy and dishonest, engaging in "defamation" and "absolute evil behavior[,]" and "trying to weasel [her] way out of paying the full amount of [a funeral chapel]'s bill"; suggested that Keys perhaps was responsible for her grandson's death; stated that, if he ever saw her again, "it [would] be too soon"; and wished Keys "only the worst from here on out." Keys filed a complaint against Basinger with the Attorney Grievance Commission ("the Commission"), Petitioner.

On July 22, 2013, on the Commission's behalf, Bar Counsel filed in this Court a "Petition for Disciplinary or Remedial Action" against Basinger, charging him with violating Maryland Lawyers' Rules of Professional Conduct ("MLRPC") 1.4 (Communication), 1.16(a) (Declining or Terminating Representation), 8.4(d) (Conduct That is Prejudicial to the Administration of Justice), and 8.4(a) (Violating the MLRPC).

On December 16, 2013, this Court designated the Honorable Judith C. Ensor ("the hearing judge") of the Circuit Court for Baltimore County to hear this attorney discipline

proceeding. On February 25 and 26, 2014, the hearing judge conducted a hearing. On April 17, 2014, the hearing judge filed in this Court an opinion including findings of fact and conclusions of law, concluding that Basinger had not violated MLRPC 1.4(b), 1.16(a)(3), or 8.4(d).

On January 13, 2015, we heard oral argument. For the below reasons, we reprimand Basinger for violating MLRPC 8.4(d).

## BACKGROUND

The hearing judge found the following facts, which we summarize.

On June 6, 1983, this Court admitted Basinger to the Bar of Maryland. Since approximately 2005, Basinger has been a solo practitioner. Keys worked as a legal secretary for Basinger off and on for several years, but was no longer doing so in 2012. Thus, at the time of his alleged misconduct, Basinger was Keys's brother-in-law, her former employer, and her lawyer.

On February 18, 2012, Keys's grandson died in motor vehicle accident. On that date, Keys telephoned her sister (Basinger's wife) and informed her of Keys's grandson's death. Basinger got on the telephone and offered legal assistance. Keys responded in the affirmative. Thus, on that date, Basinger and Keys entered into an attorney-client relationship. During the following weeks, Basinger mailed letters to third parties on Keys's behalf and investigated the circumstances of Keys's grandson's death.

On March 8, 2012, an insurance company received from Keys a letter in which Keys denied that she had retained Basinger. On March 9, 2012, Basinger learned of Keys's letter. On March 12, 2012, Basinger mailed to Keys two letters, both of which were on his

firm's letterhead.  As of that date, Keys was either Basinger's client or his recently terminated former client; Basinger testified that he "quit" through his first letter.

In his first letter, Basinger described what he had done on Keys's behalf; called Keys "A TRUE C[**]T" who had "finally f[***]ed up one time too many"; accused Keys of being dishonest; and stated that, if he ever saw her again, "it [would] be too soon."  In his second letter, Basinger shared what he had learned while investigating the circumstances of Keys's grandson's death; suggested that Keys perhaps was responsible for her grandson's death; called Keys "a reprehensible human being" with "worthless progeny"; accused Keys of being lazy and dishonest; and wished Keys "only the worst from here on out."[1]  On March 16, 2012, Basinger mailed to Keys a third letter, in which he accused Keys of "trying to weasel [her] way out of paying the full amount of [a funeral chapel]'s bill[,]" for her grandson's viewing and funeral.[2]

The hearing judge stated: "It is abundantly clear that [] Basinger wrote the letters to his sister-in-law and that, in her estimation, [Keys] received the letters from her sister's husband, not her attorney."  There was no indication that Basinger's statements negatively impacted Keys's perception of the legal profession.  At the hearing, Basinger denied that his conduct was wrongful.

---

[1]The record contains Basinger's second letter, in which he also accused Keys of having a "pathetic and dysfunctional world."

[2]At the hearing, Basinger testified that he was instrumental in directing Keys and her daughter to the funeral chapel.  In a letter that was dated February 28, 2012 and addressed to the funeral chapel's director, Basinger "guarantee[d] full payment of [the funeral chapel's] reasonable bill."

**STANDARD OF REVIEW**

In an attorney discipline proceeding, this Court reviews for clear error a hearing judge's findings of fact, and reviews without deference a hearing judge's conclusions of law. See Md. R. 16-759(b)(2)(B) ("The Court [of Appeals] shall give due regard to the opportunity of the hearing judge to assess the credibility of witnesses."); Attorney Grievance Comm'n v. McDowell, 439 Md. 26, 35, 93 A.3d 711, 716 (2014) ("[T]his Court reviews for clear error a hearing judge's findings of fact[.]") (Citations omitted)); Md. R. 16-759(b)(1) ("The Court of Appeals shall review de novo the [hearing] judge's conclusions of law."). This Court determines whether clear and convincing evidence establishes that a lawyer violated the MLRPC. See Md. R. 16-757(b) ("The [Commission] has the burden of proving the averments of the petition [for disciplinary or remedial action] by clear and convincing evidence.").

**DISCUSSION**

**(A) Findings of Fact**

Basinger does not except to any of the hearing judge's findings of fact. The Commission does not except to any of the hearing judge's findings of fact, and asserts that Basinger mailed the three letters to Keys "within the constraints of an attorney-client relationship."

We agree. The hearing judge found that, as of March 12, 2012 (on which Basinger mailed his first two letters), Keys was either Basinger's client or his recently terminated former client. Significantly, nowhere in Basinger's response to the Commission's filing, and at no time at oral argument, did Basinger or his counsel dispute that Basinger mailed

- 4 -

the three letters at least partially in his capacity as Keys's lawyer. Basinger's first letter includes detailed information about what Basinger had done on Keys's behalf in his capacity as her lawyer, and, like his other two letters, is headed: "Re: Estate of [Keys's grandson], a minor[.]" From beginning to end, Basinger's first letter reads:

Re: Estate of [Keys's grandson], a minor

Dear Rosina [Keys]:

I've just finished a lengthy conversation with a PIP adjuster at [an insurance company] who tried to create a three-way conversation with you, but you refused. However, she did fax a copy of the letter you faxed to her earlier to me. I told you at 7:00 p.m. on Saturday evening when you called [my wife] and I begging for money to bury [your grandson] that I would handle this matter for you. I also interceded with [the director] at [a f]uneral [c]hapel and she knocked off more than $900 of the bill for his funeral. I also stood ready to write you a check for the full amount of [your grandson]'s funeral. I told you that I would and you assured me that you approved of my investigating how this accident took place.

[A] retired Baltimore City detective, who has worked for me now for more than eight years, was able to get all the information from the Crash Team, the specially assigned Auto Fatality Unit of the Baltimore County Police, to give him everything he needed to make decisions about this case. When I talked to you earlier today on March 9, 2012, the only thing you told me was that you challenged whether I had gotten any reduction of [the funeral chapel's] bill. I also told you that [a different insurance company] has a larger policy and would probably be able to cover all of the outstanding bill and reduce a substantial amount of the $5000 of borrowed money to pay for [your grandson]'s funeral.

You told . . . a[n insurance company's] corporate attorney[] that you had not asked me, directed me, contracted me or approved my efforts on your behalf. While I can understand the intense emotional stress that you're under, a lie is a lie. For you to spit on the kindness I showed to you by trying to sort out the details of this accident and my willingness to come to your financial aid is reprehensible.

You made a statement to another attorney that I had misrepresented my relationship with you as attorney/client. You and I had discussed on more

than one occasion that [your daughter] was in a halfway house and would not be capable of managing this matter. The other option, your former son-in-law, you did not think was a good idea either. And then you tell [the attorney] that you had never talked to me. That is called defamation of character, and, if true, could get me disbarred and at least sanctioned and/or suspended. And your motivation? My kindness? My tolerance of your absolute evil behavior over all of these years?

In closing, YOU ARE A TRUE C[**]T! If I ever see you again, it will be too soon. I trust, once the full extent of all that I have to show [my wife] is revealed, that she and your two nieces will feel the same way. You finally f[***]ed up one time too many!

Yours truly,

[signature]

C. Stephen Basinger

Perhaps even more importantly, as the hearing judge noted, Basinger testified that he "quit" representing Keys through his first letter. Thus, Basinger's purpose in mailing the first letter was to formally acknowledge the representation's termination.

### (B) Conclusions of Law

Basinger does not except to any of the hearing judge's conclusions of law.[3] The Commission excepts to the hearing judge's conclusion that Basinger did not violate MLRPC 8.4(d) in mailing the letters to Keys.[4] For the below reasons, we sustain the

---

[3]In his response to the Commission's filing, Basinger contended that this Court would violate the Free Speech Clause of the First Amendment to the United States Constitution by sanctioning him for his statements. At oral argument, Basinger's counsel withdrew that contention in light of Attorney Grievance Comm'n v. Frost, 437 Md. 245, 262, 85 A.3d 264, 273 (2014) ("Respondent's statements are not entitled to protection under the First Amendment.").

[4]The Commission also excepts to the hearing judge's conclusion that Basinger did not violate MLRPC 8.4(d) in allegedly continuing to act on Keys's behalf after the

- 6 -

Commission's exception.

**MLRPC 8.4(d) (Conduct that is Prejudicial to the Administration of Justice)**

"It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice[.]" MLRPC 8.4(d). "Generally, a lawyer violates MLRPC 8.4(d) where the lawyer's conduct negatively impacts the public's perception of the legal profession." McDowell, 439 Md. at 39, 93 A.3d at 719 (citation, ellipses, and internal quotation marks omitted). In other words, a lawyer violates MLRPC 8.4(d) where the lawyer's conduct "tends to bring the legal profession into disrepute." Attorney Grievance Comm'n v. Reno, 436 Md. 504, 511, 83 A.3d 781, 785 (2014) (citation and internal quotation marks omitted).

For example, in Attorney Grievance Comm'n v. Alison, 317 Md. 523, 540, 531, 565 A.2d 660, 668, 663-664 (1989), this Court held that a lawyer violated MLRPC 8.4(d) by, among other things, telling an employee of a clerk's office "you have to take the f[***]ing papers"; referring to opposing counsel as a "son of a b[****]" and an "a[******]"; and saying "f[***] you" to the employee's supervisor. This Court acknowledged that "[a]ttorneys are not prohibited from using profane or vulgar language at all times and under all circumstances"; nonetheless, this Court explained that "[i]t is not difficult to visualize the damage to the court system and to the reputation of the legal profession that would result if attorneys were free to conduct their daily business with court clerks in the manner

---

representation's termination. The Commission, however, does not except to the hearing judge's conclusion that Basinger did not violate MLRPC 1.16(a)(3) (Terminating Representation); thus, we do not address the matter.

employed by" the lawyer.  Id. at 538, 565 A.2d at 667 (citation omitted).

Here, clear and convincing evidence persuades us to reverse the hearing judge's conclusion that Basinger did not violate MLRPC 8.4(d) by mailing to Keys letters in which he called Keys "A TRUE C[**]T" who had "finally f[***]ed up one time too many"; called Keys "a reprehensible human being" with "worthless progeny" and a "pathetic and dysfunctional world"; accused Keys of being lazy and dishonest, engaging in "defamation" and "absolute evil behavior[,]" and "trying to weasel [her] way out of paying the full amount of [a funeral chapel]'s bill"; suggested that Keys perhaps was responsible for her grandson's death; stated that, if he ever saw her again, "it [would] be too soon"; and wished Keys "only the worst from here on out."  Five circumstances are critical to our conclusion.

First, Basinger's statements were neither inartful slips of the tongue nor spoken in the heat of an oral altercation.  Basinger caused his statements to be put into writing in letters that he signed and mailed to Keys.  Basinger had an opportunity to amend his choice of words at any time before he mailed the letters to Keys.[5]  Basinger's failure to take advantage of that opportunity establishes that his statements were deliberate, not inadvertent.

Second, as discussed above, Basinger's statements were made at least partially in his capacity as Keys's lawyer.  All three of Basinger's letters are on his firm's letterhead and are headed: "Re: Estate of [Keys's grandson], a minor[.]"  Basinger's purpose in mailing the first letter was to formally acknowledge the representation's termination.

---

[5]In fact, the hearing judge found that Basinger dictated his first two letters three days before mailing them to Keys.

- 8 -

Basinger's first letter includes detailed information about what Basinger had done on Keys's behalf. Basinger's second letter includes information that he had learned while investigating the circumstances of Keys's grandson's death. Basinger's third letter pertains to the payment of the funeral chapel's bill.

Third, Basinger's statements were insults aimed at the letters' recipient (his client, Keys) rather than a third party. For example, Basinger did not make statements along the lines of "The judge was foolish to rule in the other party's favor" or "Opposing counsel has been rude throughout these proceedings."

Fourth, Basinger's statements were not limited to an isolated incident; Basinger engaged in a pattern of numerous insults that spanned three letters. In his first letter, Basinger called Keys "A TRUE C[**]T" who had "finally f[***]ed up one time too many"; accused Keys of being dishonest; and stated that, if he ever saw her again, "it [would] be too soon." In his second letter, Basinger suggested that Keys perhaps was responsible for her grandson's death; called Keys "a reprehensible human being" with "worthless progeny" and a "pathetic and dysfunctional world"; accused Keys of being lazy and dishonest; and wished Keys "only the worst from here on out." In his third letter, Basinger accused Keys of "trying to weasel [her] way out of paying the full amount of [the funeral chapel]'s bill."

Finally, Basinger chose the word "c[**]t" to refer to Keys. Merriam-Webster defines "c[**]t" as a "usually disparaging [and] obscene" term for a "woman." C[**]t, Merriam-Webster, http://www.merriam-webster.com/dictionary/c[**]t. In turn, Merriam-Webster defines "obscene" as "very offensive in usually a shocking way." Obscene,

Merriam-Webster, http://www.merriam-webster.com/dictionary/obscene.  In other words, "c[**]t" is a shockingly offensive insult for a woman, and thus connotes sexism, misogyny, and degradation of women.  Cf. Passananti v. Cook Cnty., 689 F.3d 655, 665 (7th Cir. 2012) ("A raft of case law . . . establishes that the use of sexually degrading, gender-specific epithets, such as . . . 'c[**]t,' . . . has been consistently held to constitute harassment based upon sex."  (Citations and internal quotation marks omitted) (first ellipses in original)).

In short, (1) at least partially in his capacity as Keys's lawyer, (2) Basinger put into letters (3) numerous insults, (4) including the obscene, sexist word "c[**]t," (5) that were aimed at the letters' recipient (his client, Keys).  Together, these five circumstances clearly and convincingly establish that Basinger's conduct "tends to bring the legal profession into disrepute[,]" and thus were prejudicial to the administration of justice.  Reno, 436 Md. at 511, 83 A.3d at 785 (citation and internal quotation marks omitted).  "It is not difficult to visualize the damage . . . to the reputation of the legal profession that would result if attorneys were free to" communicate with their clients in the egregiously unprofessional manner that Basinger employed.  Alison, 317 Md. at 538, 565 A.2d at 667.  Basinger's conduct would not be tolerated from one's coworker, much less one's lawyer.  Cf. Burns v. McGregor Elec. Indus., Inc., 989 F.2d 959, 966 (8th Cir. 1993) ("[F]or a co-employee to refer to a woman employee as a . . . 'c[**]t' in the work place is indefensible.").

We emphasize that our conclusion is based on this attorney discipline proceeding's particular circumstances.  We do not hold that a lawyer violates MLRPC 8.4(d) by slighting a client in any way or by using obscenities at any time.  See Alison, 317 Md. at 538, 565 A.2d at 667 ("Attorneys are not prohibited from using profane or vulgar language at all

- 10 -

times and under all circumstances." (Citation omitted)). We simply recognize that Basinger's egregiously unprofessional manner of communicating with Keys grossly exceeded an appropriate expression of grievances with Keys, and thus tended to bring the legal profession into disrepute.

Basinger raises red herrings in contending that he did not violate MLRPC 8.4(d) because: (1) his statements were "private" in the sense that they were "not known or intended to be known publicly"; and (2) there was no indication that Basinger's statements negatively impacted Keys's perception of the legal profession.[6] Both of Basinger's contentions are foreclosed by this Court's holding in Attorney Grievance Comm'n v. Saridakis, 402 Md. 413, 431-32, 430, 936 A.2d 886, 897, 896 (2007), in which, writing for this Court, the Honorable Glenn T. Harrell, Jr. concluded that a lawyer violated MLPRC 8.4(d) by negatively impacting the public's perception of the legal profession by violating MLRPC 1.8(c) (Conflict of Interest: Current Clients: Preparing Instrument Giving Lawyer Any Substantial Gift); in turn, the lawyer violated MLRPC 1.8(c) because "[a] reasonable member of the public could well look askance at [the] arrangement [that the lawyer made] and suspect that collusion could have taken place." (Footnote and emphasis omitted). As

---

[6]Keys's testimony seemingly undermines the hearing judge's finding. Specifically, Keys testified that she "didn't care about [Basinger's first letter's] **first** page[,]" in which Basinger accused Keys of engaging in dishonesty, "defamation[,]" and "absolute evil behavior[.]" (Emphasis added). Keys added that the first page "didn't bother [her] at all" because "that's just [Basinger], that's just how he is." By contrast, Keys **was** "bothered" by "the **second** page[,]" in which Basinger called Keys "A TRUE C[**]T[.]" (Emphasis added). Keys added: "It angered [her] that anyone should . . . use that kind of language, especially **an attorney** on his letterhead, that he signed . . . . No woman deserves to be called that." (Emphasis added). Additionally, it is undisputed that Basinger's statements prompted Keys to file a complaint against Basinger with the Commission.

- 11 -

Judge Harrell aptly explained, "[f]or purposes of finding a violation of M[L]RPC 1.8(c), . . . the objective perception by a member of the public, the protection of whom [the MLRPC] are created and enforced, is the proper vantage point from which to consider whether an actionable appearance of impropriety occurred." Id. at 430 n.10, 936 A.2d at 896 n.10 (emphasis added) (citation omitted).

Thus, in Saridakis, id. at 430 n.10, 430, 936 A.2d at 896 n.10, 896, in determining whether the lawyer's conduct violated MLRPC 1.8(c), this Court applied the "objective" standard of whether "[a] reasonable member of the public could well look askance at such an arrangement and suspect that collusion *could* have taken place[,]" not the subjective standard of whether the lawyer's conduct actually impacted the public and/or a particular person (*e.g.*, a complainant) who is involved with the attorney discipline proceeding. Such a standard is equally applicable in determining whether a lawyer's conduct violates MLRPC 8.4(d) by engaging in conduct that negatively impacts the public's perception of the legal profession.

As Judge Harrell pointed out in Saridakis, id. at 430 n.10, 936 A.2d at 896 n.10, this objective standard promotes our purpose to protect the public and the public's confidence in the legal profession. Indeed, departing from Saridakis would shift this Court's focus from a lawyer's conduct to: (1) other people's subjective perceptions of the lawyer's conduct; and (2) whether other people knew of the lawyer's conduct. Such a framework would lead to the absurd result that whether a lawyer violated MLRPC 8.4(d) would depend on: (1) how sensitive other people are; and (2) how much the lawyer's conduct was publicized. For example, a lawyer could violate MLRPC 8.4(d) by making certain

statements to an extremely sensitive client, yet the lawyer would not violate MLPRC 8.4(d) by making the exact same statements to an extremely thick-skinned client. As another example, a lawyer could violate MLRPC 8.4(d) by making certain statements to a client if the client publicized the lawyer's statements; yet, the lawyer would not violate MLRPC 8.4(d) by making the exact same statements to the client if the client refrained from telling anyone else about the lawyer's statements.[7]

The objective standard that this Court articulated in Saridakis is strengthened even further by the circumstance that, as in Saridakis, in countless other attorney discipline proceedings, this Court has held that lawyers violated MLRPC 8.4(d) by engaging in conduct that negatively impacted the public's perception of the legal profession, even though this Court did not mention, let alone consider, whether the lawyers' conduct actually negatively impacted the perception of the legal profession of the public and/or particular people who were involved with the attorney discipline proceedings. See, e.g., Attorney Grievance Comm'n v. O'Leary, 433 Md. 2, 40, 69 A.3d 1121, 1143-44 (2013); Attorney Grievance Comm'n v. Heung Sik Park, 427 Md. 180, 194, 46 A.3d 1153, 1161 (2012); Attorney Grievance Comm'n v. Butler, 395 Md. 1, 15, 909 A.2d 226, 234 (2006);

---

[7]Ultimately, it does not matter whether the lawyer's conduct was publicized before this Court considers the attorney discipline proceeding. By issuing an opinion that will become available to anyone with an internet connection, this Court will effectively inform the public of the lawyer's conduct. It would be ironic if we issued a publicly available opinion in which we recited the lawyer's conduct, then concluded that the lawyer's conduct could not have negatively impacted the public's perception of the legal profession because the public did not actually know of the lawyer's conduct.

Attorney Grievance Comm'n v. Kapoor, 391 Md. 505, 532, 894 A.2d 502, 518 (2006); Attorney Grievance Comm'n v. White, 354 Md. 346, 363-64, 731 A.2d 447, 457 (1999).

Indeed, on the other side of the coin, in Attorney Grievance Comm'n v. Rand, 411 Md. 83, 95-96, 981 A.2d 1234, 1242 (2009), this Court held that a lawyer did not violate MLRPC 8.4(d), but did not even mention, let alone consider, whether the lawyer's conduct actually negatively impacted the perception of the legal profession of the public and/or a particular person who was involved with the attorney discipline proceeding. Thus, we are unpersuaded by Basinger's reliance on Rand, as well as his conjecture that, in Rand, there was no indication that the lawyer's conduct had gained "public notoriety[.]"

As he does with Rand, Basinger misinterprets Attorney Grievance Comm'n v. Link, 380 Md. 405, 429, 408-13, 844 A.2d 1197, 1211-12, 1199-1202 (2004), in which this Court held that a lawyer did not violate MLRPC 8.4(d) by yelling at an employee of the Motor Vehicle Administration, and concluded that a lawyer violates MLRPC 8.4(d) through "purely private conduct" only if the conduct "is criminal or so egregious as to make the harm, or potential harm, flowing from it patent[.]" Basinger is mistaken in apparently assuming that, in Link, by "private," this Court meant "not known or intended to be known publicly." Five circumstances establish that, in Link, by "private," this Court meant "unrelated to the practice of law."

First, in Link, id. at 428, 844 A.2d at 1211, this Court explained that the lawyer's conduct was "private" because, "[a]lthough [the lawyer] was representing a client at the time of the incident, that fact was not readily apparent or sought to be emphasized. Indeed, the [lawyer] resisted informing the [employee] that he was a lawyer."

- 14 -

Second, in <u>Link</u>, <u>id.</u> at 428, 427, 844 A.2d at 1211, 1210, in distinguishing <u>Attorney Grievance Comm'n v. Childress</u>, 360 Md. 373, 385-86, 758 A.2d 117, 123 (2000), this Court acknowledged that, in <u>Childress</u>, the lawyer engaged in "purely private" conduct—*i.e.*, conduct that was "outside his . . . role as a lawyer[.]"

Third, in <u>Link</u>, 380 Md. at 421, 844 A.2d at 1207, this Court distinguished multiple cases, including <u>Alison</u>, 317 Md. 523, 565 A.2d 660, on the ground that, in those cases, "the offending conduct occurred during the actual litigation process or while interviewing clients or others in connection with litigation or potential litigation."

Fourth, on a related note, under Basinger's interpretation of <u>Link</u>, <u>Link</u> and <u>Alison</u> would be irreconcilable with each other. In <u>Alison</u>, 317 Md. at 540, 531, 565 A.2d at 668, 663-64, this Court held that a lawyer violated MLRPC 8.4(d) by, among other things, telling an employee of a clerk's office "you have to take the f[***]ing papers." As Basinger points out, the lawyer did so "in the presence of" multiple employees of the clerk's office, <u>id.</u> at 531, 565 A.2d at 663; thus, the lawyer's conduct was not "private" in the sense of "not known or intended to be known publicly." In <u>Link</u>, 380 Md. at 429, 408-13, 844 A.2d at 1212, 1199-1202, this Court held that a lawyer did not violate MLRPC 8.4(d) by yelling at an employee of the Motor Vehicle Administration. Obviously, every office of the Motor Vehicle Administration contains several customers at nearly every office hour, and it is extremely dubious that none of those customers heard the lawyer's yelling. Indeed, the lawyer testified that the employee "was incredibly 'rude' to three customers who were in line before" him, thus indicating other customers could hear any conversations with the employee. <u>Id.</u> at 412, 844 A.2d at 1201. Accordingly, the lawyer's conduct in <u>Link</u>, like

- 15 -

the lawyer's conduct in <u>Alison</u>, was not "private" in the sense of "not known or intended to be known publicly."

Fifth, in <u>Attorney Grievance Comm'n v. Hall</u>, 408 Md. 306, 330-31, 969 A.2d 953, 967 (2009), writing for this Court, Chief Judge Robert M. Bell—who also authored this Court's opinion in <u>Link</u>—explained that, in <u>Link</u>, 380 Md. at 429, 844 A.2d at 1211-12, "we concluded that conduct, in the private world of attorneys, unrelated to actual litigation situations, is only prejudicial to the administration of justice when such purely private conduct is criminal or so egregious as to make the harm, or potential harm, flowing from it patent[.]"

Thus, in <u>Link</u>, by "private," this Court meant "unrelated to the practice of law." Accordingly, <u>Link</u> is not dispositive where (as here) a lawyer engages in conduct that is related to the practice of law.

In sum, applying the objective standard that this Court articulated in <u>Saridakis</u>, we conclude that Basinger's conduct—in his capacity as Keys's lawyer, putting into letters numerous insults (including the obscene, sexist word "c[**]t") that were aimed at the letters' recipient (his client, Keys)—would negatively impact "[a] reasonable member of the public['s]" perception of the legal profession. Thus, Basinger violated MLRPC 8.4(d).

**(C) Sanction**

In the event this Court sustains the exception, the Commission recommends that we reprimand Basinger. Basinger, of course, does not recommend a sanction.

In <u>McDowell</u>, 439 Md. at 45-46, 93 A.3d at 722-23, this Court stated:

> This Court sanctions a lawyer not to punish the lawyer, but instead to

protect the public and the public's confidence in the legal profession. This Court protects the public by: (1) deterring other lawyers from engaging in similar misconduct; and (2) suspending or disbarring a lawyer who is unfit to continue to practice law.

In determining an appropriate sanction for a lawyer's misconduct, this Court considers: (a) the duty violated; (b) the lawyer's mental state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors.

Aggravating factors include: (a) prior attorney discipline; (b) a dishonest or selfish motive; (c) a pattern of misconduct; (d) multiple violations of the MLRPC; (e) bad faith obstruction of the attorney discipline proceeding by intentionally failing to comply with the Maryland Rules or orders of this Court; (f) submission of false evidence, false statements, or other deceptive practices during the attorney discipline proceeding; (g) refusal to acknowledge the wrongful nature of the misconduct; (h) vulnerability of the victim; (i) substantial experience in the practice of law; (j) indifference to making restitution; and (k) illegal conduct, including that involving the use of controlled substances.

Mitigating factors include: (a) the absence of prior attorney discipline; (b) absence of a dishonest or selfish motive; (c) personal or emotional problems; (d) timely good faith efforts to make restitution or to rectify consequences of the misconduct; (e) full and free disclosure to the Commission or a cooperative attitude toward the attorney discipline proceeding; (f) inexperience in the practice of law; (g) character or reputation; (h) physical disability; (i) a mental disability or chemical dependency including alcoholism or drug abuse where: (1) there is medical evidence that the lawyer is affected by a chemical dependency or mental disability; (2) the chemical dependency or mental disability caused the misconduct; (3) the lawyer's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and (4) the recovery arrested the misconduct and recurrence of the misconduct is unlikely; (j) delay in the attorney discipline proceeding; (k) the imposition of other penalties or sanctions; (l) remorse; and (m) remoteness of prior violations of the MLRPC.

(Brackets, citations, footnote, and internal quotation marks omitted).

Here, as to the duty violated and Basinger's mental state, Basinger violated MLRPC

8.4(d) by intentionally mailing to Keys letters in which he called her, among other things,

- 17 -

"A TRUE C[**]T[.]" As to the potential or actual injury that Basinger's misconduct caused, Basinger's misconduct was so egregiously unprofessional and demeaning to Keys that, viewed objectively, it would negatively impact the public's perception of the legal profession.

We note three aggravating factors: (1) a pattern of misconduct, as Basinger engaged in a pattern of numerous insults that spanned three letters; (2) refusal to acknowledge the wrongful nature of the misconduct; and (3) substantial experience in the practice of law, as Basinger has been a member of the Bar of Maryland for more than thirty years. We note one mitigating factor: the absence of prior attorney discipline.

We agree with the Commission that the appropriate sanction for Basinger's misconduct is a reprimand, which should suffice to deter other lawyers from communicating with their clients in the egregiously unprofessional manner that Basinger employed.

For the above reasons, we reprimand Basinger.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16-761(b), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST CARL STEPHEN BASINGER.**