*Attorney Grievance Commission of Maryland v. Amber Lisa Maiden*, Misc. Docket AG No. 72, September Term, 2020.

**ATTORNEY DISCIPLINE — SANCTIONS — INDEFINITE SUSPENSION**

The Court of Appeals indefinitely suspended an attorney who (1) created, failed to recognize, and failed to act to resolve a conflict of interest; and (2) sent an antisemitic and highly offensive 20-page letter to a client and then later knowingly and intentionally misrepresented to Bar Counsel that she had sent the letter by mistake. Such conduct violated Maryland Attorneys' Rules of Professional Conduct 1.1 (Competence), 1.7 (Conflict of Interest — General Rule), 1.8 (Conflict of Interest; Current Clients; Specific Rules), 1.16 (Declining or Terminating Representation), 8.1 (Bar Admission and Disciplinary Matters), and 8.4 (Misconduct).

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Docket AG No. 72

September Term, 2020

_____

ATTORNEY GRIEVANCE
COMMISSION OF MARYLAND

v.

AMBER LISA MAIDEN

_____

Fader, C.J.,
Watts,
Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

_____

Opinion by Fader, C.J.

_____

Filed: July 28, 2022

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The Attorney Grievance Commission of Maryland (the "Commission"), acting through Bar Counsel, filed a Petition for Disciplinary or Remedial Action against Amber Lisa Maiden, arising out of her representation of Brian Riese. The Commission alleged that Ms. Maiden committed several violations of the Maryland Attorneys' Rules of Professional Conduct ("MARPC") resulting from her: (1) creation of, failure to recognize, and failure to terminate representation due to a conflict of interest that arose when she made herself a co-party to Mr. Riese's administrative appeal of the dismissal of a discrimination complaint and asserted a 50% share of any punitive damages award; (2) sending Mr. Riese a 20-page letter containing numerous antisemitic, personally insulting, profane, and otherwise inappropriate comments; and (3) false claim to Bar Counsel that she had sent the letter by mistake. The Commission asserted that Ms. Maiden's conduct violated MARPC 19-301.1 (Competence) (Rule 1.1), 19-301.7 (Conflict of Interest − General Rule) (Rule 1.7), 19-301.8 (Conflict of Interest; Current Clients; Specific Rules) (Rule 1.8), 19-301.16 (Declining or Terminating Representation) (Rule 1.16), 19-308.1 (Bar Admission and Disciplinary Matters) (Rule 8.1), and 19-308.4 (Misconduct) (Rule 8.4).[1]

A hearing judge found by clear and convincing evidence that Ms. Maiden had committed all the violations alleged by the Commission. The hearing judge also found the existence of several aggravating and two mitigating factors. Neither party filed exceptions. The Commission recommended a sanction of indefinite suspension, which we imposed by per curiam order following oral argument, which Ms. Maiden did not attend. *Attorney*

---

[1] Throughout this opinion, we will use shortened references to the rules as identified in this paragraph in the parentheticals following each rule.

*Grievance Comm'n v. Maiden*, 478 Md. 527, 528 (2022).  We now explain the reasons for our order.

## BACKGROUND

This Court may accept a hearing judge's findings as established when no exceptions are filed.  *See Attorney Grievance Comm'n v. Silbiger*, 478 Md. 607, 617, Misc. Docket AG No. 57, Sept. Term, 2020, (filed May 26, 2022); *see also* Md. Rule 19-740(b)(2)(A). Here, because no exceptions were filed, we treat as established the following facts, which the hearing judge found to have been proved by clear and convincing evidence.

### *Ms. Maiden's Representation of Brian Riese*

Mr. Riese, a former security technical specialist with the United States Department of State, filed an Equal Opportunity complaint against the State Department after he was removed from his post in 2018.  Mr. Riese contended that he had been discriminated against on the basis of his gender.  The State Department dismissed his complaint.

In September 2019, Mr. Riese retained Ms. Maiden to represent him in filing an appeal of the dismissal to the Equal Employment Opportunity Commission ("EEOC"). The retainer agreement provided for a flat fee of $1,500 for the written appeal and contemplated a need "to renegotiate a new fee schedule" if Ms. Maiden were to provide "any additional legal services or representation."

After entering her appearance, Ms. Maiden made multiple requests to the State Department for records in connection with her preparation of Mr. Riese's appeal.  She claimed that the State Department failed to provide the requested documentation or provided it "in pieces" or "in a very jumbled kind of way."

Three days before the deadline for filing Mr. Riese's appeal, Ms. Maiden and Mr. Riese engaged in an email discussion that addressed, among other things, Mr. Riese's damages claim. Ms. Maiden told Mr. Riese that the EEOC generally had limited authority to award damages, but that 42 U.S.C. § 1981 operated as a "loophole." Ms. Maiden stated that she had "never quite understood Section 1981 as it simply does not apply to most EEO cases," but informed Mr. Riese that it did apply to his case. She asked him to "read up on Section 1981, and brainstorm on how to get your damages out of it."

The following day, Mr. Riese responded that § 1981 appeared to him to be limited to claims of racial discrimination and asked whether Ms. Maiden, who is Black, could "join the cases." Ms. Maiden agreed, opining that they could argue that "in this case, [Ms. Maiden's] rights are tied to [Mr. Riese's] rights," "both o[f their] constitutional rights ha[d] been violated" by the State Department's responses to her records requests, and "the door ha[d] been opened to a [§] 1981 claim" based on Ms. Maiden's race. She advised that such a § 1981 claim was "the only way to get at punitive [damages]," and concluded that they should "go for it" and request ten million dollars in damages. Ms. Maiden later suggested raising the damages demand to $20 million.

Contemporaneously, as part of a series of text messages, Ms. Maiden sent Mr. Riese the following:

> I hope it goes without saying (and I do this with all my punitive damage clients) I expect you to split any punitive damages with me 50/50 -usually I ask for 35%-but you literally would not be able to make this argument without me, so that's why I'm asking for 50% of the punitive.

3

Included later in the same chain of texts is the following message from Mr. Riese: "I'm onboard. It makes me giggle just to say: Twenty Million Dollars." It is unclear whether Mr. Riese's statement about being "onboard" referred only to the size of the damages request or to Ms. Maiden's proposed split of any punitive damages award.

On October 29, 2019, Ms. Maiden filed the brief. Two days later, Ms. Maiden forwarded Mr. Riese a new retainer agreement, which reflected what she believed to be their new financial arrangement for her continued representation. Mr. Riese did not sign the new agreement.

### The Breakdown of the Relationship

On November 6, 2019, during their only in-person meeting, Ms. Maiden and Mr. Riese discussed Ms. Maiden's claim to a 50% share of any punitive damages award. At the hearing in this matter, the parties presented divergent recollections of the meeting. Mr. Riese recalled that the parties "came to a tentative agreement" concerning Ms. Maiden's share of any punitive damages award, which he identified as "significantly less than [] 50%." He believed that Ms. Maiden was going to continue representing him, left her with case-related documents, and awaited a new retainer agreement.

Ms. Maiden, by contrast, recalled a "very traumatic" meeting in which Mr. Riese "did all of the talking," was "very aggressive," and "meant to be threatening and intimidating." She testified that the parties never came to any agreement concerning her representation. The hearing judge credited Ms. Maiden's account of the meeting, found that Mr. Riese's behavior was "aggressive, threatening and intimidating," and found that Ms. Maiden "felt demeaned and insulted as a result of Mr. Riese's comments."

4

On December 2, Ms. Maiden sent Mr. Riese an email telling him that she would not represent him without a contract and that she would send him a new one, which he could "choose to sign . . . or not," "a[]long with an explanation as to why [she had] articulated the terms of this contract as such." Mr. Riese responded that he would be reluctant to sign a new contract that deviated from what he understood was their verbal agreement. Ms. Maiden replied that she was amenable to renegotiating "the terms of the initial agreement," but felt she was "being ambushed or otherwise disrespected." She accused Mr. Riese of mistaking her "for someone far less intelligent," which she said was "almost always the case when dealing with white Americans." Later that afternoon, Mr. Riese wrote back that he took "great offense" to Ms. Maiden's accusation that he would hold her "in less regard based on [her] race," and asked her to return case-related documents if she wished to end their attorney-client relationship.

Ms. Maiden responded about nine hours later with an email to which she attached an encrypted, 20-page letter addressed to Mr. Riese. She included the password needed to access the letter in the body of the email. The letter purports to be an effort to explain to Mr. Riese how and why his conduct at their in-person meeting and refusal to renegotiate the financial terms of their relationship had offended Ms. Maiden. It does so, however, using language that is antisemitic, personally insulting, profane, and otherwise inappropriate, including the following excerpts, among others:

> conflict- as we say in the diversity/inclusion circles - is good. Or at least it's to be expected. It's a part of life, and it simply has to be managed. So, let's get to managing this conflict. It's about to get really real...I gotta break into my African-American dialect (lots of cursing) so you will understand- I am 100% that bitch... and not to be fucked with.

5

. . .

I'm your attorney. And that is actually a very sacred relationship. Almost like marriage [. . .] because our interests are linked. Our financial interests, our representational interests, we both want to win and we both want the money...

. . .

And, I can tell, from my first in person conversation with you, that the best, in your mind, is lots of money. But me? I'm different. So, we have a values conflict already. (We have to manage it.) I can tell you right now, money does not move me, the way it moves you. I would say you are obsessed with it, and that's very unhealthy. At the risk of offending you, I am going to say, it's probably because you're Jewish (I think) and that seems to be a part of your culture, (with the men anyway, the women are different.)

I get that. And I am not dissing your culture. Not exactly. But I am saying that all cultures have some dysfunction and unhealthiness to them. (Black Americans for example, hate to fucking read and write...and there are reasons for that-primarily slavery.) Jews don't have that problem. They are some reading and writing mfers...and some calculating mfers, all into the money. Sometimes it's too much. It turns into a love of money. And this is a very dangerous thing for the Jews in Germany.

. . .

You white people...almost everything you say, and everything you do, really pisses us off (Ghetto Princess talking now) because you people are so insensitive to all the fucked up shit that happens to us (like German Nazis) and you expect us to cry over your pain. Pulease.

. . .

[Y]ou do all kinds of mental gymnastics to avoid admitting the fact that the UNITED STATES GOVERNMENT locked us the fuck up in them hoods, just like the Germans did them Jews. America has its own holocaust – and if you are white in America you are straight up on the Nazi side of it. And if you think we don't know who you all are, and what you are about and that most of you who vote Republican are racist AF, and are trying to kill us off, because you just don't want to deal, well you're wrong. We know you people. It's you who don't know us.

. . .

Okay, so let's get to it. Let's talk about the money. You don't want to give me 50% of the punitive. Well technically...if we ever see them

6

punitive damages (which is sucha crap shoot) YOU CAN ONLY GET TO THEM BECAUSE OF ME! ONLY BECAUSE OF ME!

This law, that we are requesting the punies under- IT WAS WRITTEN FOR ME. NOT YOUR WHITE ASS FOR ME.  The argument has been made under my own cause of action, because of an injury TO ME- NOT YOU.

. . .

And so for you to have the AUDACITY, to get an attitude about a law SPECIFICALLY WRITTEN FOR ME and to try and take WHAT IS MINE??????  Like who in the fuck do you think you are????

. . .

But when you was coming for my fees, the ghetto princess in me, was like This mfer is coming for you, you better back him the fuck up and off of you!

That was what it felt like.  I know why you're like this.  If you are in fact Jewish, this is a part of your culture, yall Jew boys and that money...you think it's antisemitic for people to call you out for the fucked-up shit you do.  NO.  It is not.

Ms. Maiden's letter also sets forth proposed monetary terms for their relationship going forward, including that she would be entitled to 40% of any punitive damages, would bill $600 per hour for legal services, but would give Mr. Riese back 30% of what she charged and would "hold [him] accountable for [only] 50% of the bill" if they were unsuccessful. The hearing judge found that all the statements in the letter were made "in the course of negotiating the attorney-client relationship for future representation."

The following day, Mr. Riese confirmed that he had received Ms. Maiden's letter, told her that he found it offensive and disconcerting, and stated that he was terminating her representation.  Ms. Maiden agreed to withdraw and said that she was "not surprised by [his] response to [her] letter," which she found to be "very typical . . . from someone like [him]" because he did not understand, could not understand, and did not care to understand

7

her experiences. She emphasized that their conversation about § 1981 had been "***deeply offensive*** to [her] as an African-American woman, whose family climbed up out of slavery; and has to deal with the after [e]ffects of that American institution every single day."

In a final email transmitting a withdrawal letter for Mr. Riese to provide to the State Department and the EEOC, Ms. Maiden said that she had given Mr. Riese "***the benefit of the doubt***," which she explained was why his behavior was "deeply, deeply offensive."

*Procedural History*

Mr. Riese filed a complaint with the Commission. Bar Counsel requested a written response from Ms. Maiden. When the initial response failed to address the 20-page letter to Mr. Riese, Bar Counsel followed up with a request that she do so. Ms. Maiden then asserted that she had attached the letter to her email to Mr. Riese by mistake.

In February 2021, the Commission filed a Petition for Disciplinary or Remedial Action. This Court assigned a hearing judge, who conducted a hearing at which Mr. Riese and Ms. Maiden testified. The hearing judge then issued a written opinion making findings of fact by clear and convincing evidence consistent with the recitation above. The hearing judge also made conclusions of law, including that Ms. Maiden had violated:

- Rule 1.1 (Competence), by failing "to recognize the conflict of interest created when she added a cause of action that required her to join Mr. Riese's case as an injured party[.]"

- Rule 1.7 (Conflict of Interest — General Rule), by "creat[ing] an impermissible conflict of interest," without obtaining Mr. Riese's written consent, "when she joined Mr. Riese's cause of action as a fellow injured party while continuing to represent him," thus "creat[ing] the risk that she would put her own personal interests above those of Mr. Riese."

8

- Rule 1.8 (Conflict of Interest; Current Clients; Specific Rules), by naming herself as co-party to Mr. Riese's case and thus "acquir[ing] a proprietary interest in Mr. Riese's cause of action, including a claim to 50% of any punitive damages recovered by Mr. Riese."

- Rule 1.16 (Declining or Terminating Representation), by "fail[ing] to terminate her representation of Mr. Riese" "after naming herself as an aggrieved co-party."

- Rule 8.1 (Bar Admission and Disciplinary Matters), by "knowingly and intentionally misrepresent[ing] to Bar Counsel that she attached the December 2 letter to Mr. Riese in error."

- Rule 8.4 (Misconduct), by sending Mr. Riese a letter that manifested bias and prejudice based on religion, knowingly and intentionally misrepresenting to Bar Counsel that she had not purposely sent the letter, and violating other rules of professional conduct.

Neither party filed exceptions to any of the hearing judge's findings of facts or conclusions of law.

## DISCUSSION

**I. THE HEARING JUDGE'S CONCLUSIONS OF LAW ARE SUPPORTED BY CLEAR AND CONVINCING EVIDENCE.**

In the absence of exceptions, we may treat the hearing judge's findings as established. *See Silbiger*, 2022 478Md. 607, 617 (2022) (citing Md. Rule 19-740(b)(2)(A)). However, we still conduct a non-deferential review of the hearing judge's conclusions of law, Md. Rule 19-740(b)(1), and determine whether clear and convincing evidence establishes a violation of the rules of professional conduct, *Silbiger*, 478 Md. at 617.

Based upon our independent review of the record, we agree with the hearing judge that the Commission established multiple violations of the MARPC by clear and

9

convincing evidence. Ms. Maiden's conduct underlying those violations generally falls into two categories: (1) creating, failing to recognize, and failing to resolve a conflict of interest; and (2) sending an antisemitic and highly offensive 20-page letter to Mr. Riese and, later, knowingly and intentionally misrepresenting to Bar Counsel that she had sent the letter by mistake. We address each category in turn.

**A.    Ms. Maiden Violated Multiple Rules of Professional Conduct by Creating, Failing to Recognize, and Failing to Resolve a Conflict of Interest.**

The hearing judge concluded that Ms. Maiden violated multiple rules of professional conduct by creating a conflict of interest without obtaining a written waiver of the conflict (Rules 1.7 and 1.8), failing to recognize that she had done so (Rule 1.1), and failing to terminate her representation after doing so (Rule 1.16). We agree.

A conflict of interest exists when "there is a significant risk that the representation of one or more clients will be materially limited by . . . a personal interest of the attorney." Md. Rule 1.7(a)(2). Attorneys are therefore generally precluded from "acquir[ing] a proprietary interest in [a] cause of action or subject matter of litigation the attorney is conducting for a client[.]" Md. Rule 1.8(i). That is because "[t]he risk to a client is greatest . . . when the attorney's financial interest otherwise poses a significant risk that the attorney's representation of the client will be materially limited by the attorney's financial interest[.]" Md. Rule 1.8 cmt. 3. The rules forbidding such conflicts are "'designed to avoid giving the lawyer too great an interest in the representation' . . . because a lawyer's economic interest in the outcome of the client's case can erode the lawyer's independent judgment." *Attorney Grievance Comm'n v. O' Leary*, 433 Md. 2, 36 (2013) (quoting Md.

10

Rule 1.8 cmt. 16) (holding that an attorney violated Rule 1.8(i) by representing a client in a matter in which the attorney had a proprietary interest in the outcome).

Ms. Maiden created a conflict of interest by making herself a co-claimant along with Mr. Riese for the purpose of asserting a cause of action under 42 U.S.C. § 1981. *See Attorney Grievance Comm'n v. Kane*, 465 Md. 667, 713 (2019) (concluding that a conflict of interest arose between an attorney and the attorney's clients when the attorney was joined as a defendant with the clients in an adversary proceeding). Although an attorney may continue to represent a client notwithstanding the existence of a conflict of interest in certain situations, the attorney must first, among other things, obtain the client's "informed consent, confirmed in writing." Md. Rule 1.7(b)(4). Ms. Maiden neither informed Mr. Riese of the conflict nor obtained his written (or even verbal) consent.

Ms. Maiden also created a conflict of interest by claiming a 50% share of any punitive damages Mr. Riese might obtain. Although a "reasonable contingent fee," "subject to Rule []1.5," is permitted as an exception to the general rule prohibiting an attorney from acquiring a proprietary interest in a cause of action, Md. Rule 1.8(i)(2), Ms. Maiden's demand for a 50% share of any punitive damages award was premised at least in part on her status as a co-claimant with Mr. Riese—and her stated belief that she was a more appropriate recipient of those damages than he was—not on her legal work. Ms. Maiden thus violated Rules 1.7 and 1.8(i) by creating a conflict of interest without obtaining Mr. Riese's written informed consent.

Ms. Maiden's failure to recognize the conflict and consequent failure to terminate her representation of Mr. Riese resulted in two additional violations. First, by failing to

11

recognize the conflict of interest, Ms. Maiden violated Rule 1.1, which requires that an attorney "provide competent representation to a client." This Court has previously held that the failure to recognize an inherent conflict of interest "falls below the minimum standard of competence." *See Attorney Grievance Comm'n v. Framm*, 449 Md. 620, 646 (2016).

Second, by failing to terminate her representation of Mr. Riese due to the conflict, Ms. Maiden violated Rule 1.16(a)(1), which requires an attorney who has commenced representation of a client to withdraw if "the representation will result in violation of the Maryland Attorneys' Rules of Professional Conduct[.]" Md. Rule 1.16(a)(1); *see also Attorney Grievance Comm'n v. Neverdon*, 473 Md. 631, 686 (2021) (holding that an attorney's "continued representation, without withdrawal, of the Clients despite the conflict of interest, in violation of [Rule] 1.7, as the hearing judge concluded, constitutes a violation of [Rule] 1.16(a)(1).").

In sum, we agree with the hearing judge's conclusions that Ms. Maiden's conduct in creating a conflict of interest, failing to recognize that conflict of interest, and then failing to either obtain Mr. Riese's informed consent to the conflict or terminate the representation due to the conflict violated Rules 1.1, 1.7, 1.8(i), and 1.16(a)(1). Furthermore, by violating those rules, Ms. Maiden also necessarily violated Rule 8.4(a), pursuant to which "[i]t is professional misconduct for an attorney to . . . violate or attempt to violate the Maryland Attorneys' Rules of Professional Conduct[.]" *See Framm*, 449 Md. at 664 ("We have held that, when an attorney violates a rule of professional conduct, the attorney also violates [Rule] 8.4(a)." (quoting *Attorney Grievance Comm'n v. Young*, 445 Md. 93, 106 (2015))).

**B.** **Ms. Maiden Violated Multiple Rules of Professional Conduct by Sending Her Client an Antisemitic and Highly Offensive Letter and Later Misrepresenting to Bar Counsel that the Letter Was Sent by Mistake.**

The hearing judge found by clear and convincing evidence that Ms. Maiden engaged in professional misconduct by (1) sending Mr. Riese the 20-page letter that contained antisemitic and highly offensive comments, and (2) misrepresenting to Bar Counsel that the letter had been sent to Mr. Riese by mistake. We agree.

With respect to the antisemitic and highly offensive nature of Ms. Maiden's statements, the excerpts recited above speak for themselves. The 20-page letter is laced with statements that are offensive, demeaning, personally insulting, profane, and premised on harmful religious, racial, and ethnic stereotypes.

The hearing judge concluded that Ms. Maiden's statements in the letter violated Rules 8.4(d) and (e), which provide that it is professional misconduct for an attorney to:

> (d) engage in conduct that is prejudicial to the administration of justice; [or]

> (e) knowingly manifest by words or conduct when acting in a professional capacity bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation or socioeconomic status when such action is prejudicial to the administration of justice, provided, however, that legitimate advocacy is not a violation of this section[.]

Before the hearing judge, Ms. Maiden argued that she could not have committed conduct that was prejudicial to the administration of justice when she sent the 20-page letter to Mr. Riese because she was not actively performing any legal services on his behalf at that time and the original terms of her representation agreement with Mr. Riese had already been fulfilled. The hearing judge properly rejected that argument.

13

As we explained in *Attorney Grievance Commission v. Markey*, we employ different standards in determining whether a lawyer's conduct is "prejudicial to the administration of justice" based on whether that conduct is "related to the practice of law," 469 Md. 485, 501 (2020) (quoting *Attorney Grievance Comm'n v. Basinger*, 441 Md. 703, 720 (2015)), or "purely private," *Markey*, 469 Md. at 501 (quoting *Attorney Grievance Comm'n v. Paul*, 459 Md. 526, 547 (2018)). When conduct is related to the practice of law, a lawyer's conduct is prejudicial to the administration of justice if it "'would negatively impact [the] perception of the legal profession' of 'a reasonable member of the public[.]'" *Markey*, 469 Md. at 501 (quoting *Basinger*, 441 Md. at 720). When conduct is "purely private," it is prejudicial to the administration of justice if it "is criminal or so egregious as to make the harm, or potential harm, flowing from it patent." *Markey*, 469 Md. at 501-02 (quoting *Paul*, 459 Md. at 547-48).

In *Basinger*, we found a lawyer's disparaging comments made in written correspondence to a client, who was also his sister-in-law, to be related to the practice of law. 441 Md. at 708. Notwithstanding the personal relationship between the parties and the apparently personal nature of many of the comments, we concluded that the statements were "at least partially in [the lawyer's] capacity as [a] lawyer" because they were on the firm's letterhead, referenced the subject matter of the representation, had the purpose of acknowledging the termination of the representation, and contained information related to the representation. *Id.* at 713. In *Markey*, we found offensive statements contained in email exchanges to be related to the practice of law where the exchanges were among government lawyers using their government email accounts and referring to colleagues and

14

agency-related matters, notwithstanding that the statements were neither made in connection with any legal proceeding nor shared with, or intended to be shared with, clients or anyone external to the agency. *See Markey*, 469 Md. at 503-04.

Ms. Maiden's statements were related to the practice of law. Mr. Riese indisputably had been her client, and the correspondence at issue concerned the terms of their attorney-client relationship. Ms. Maiden sent the email and letter at issue to Mr. Riese as part of a series of communications in which she was attempting to negotiate the terms of her ongoing or prospective representation of Mr. Riese. She even set forth new proposed financial terms for that representation. Whether Mr. Riese was a current client at the time Ms. Maiden wrote the letter, as opposed to merely a prospective (and past) client, is irrelevant. Correspondence related to a past, present, or prospective attorney-client relationship is conduct related to the practice of law.[2]

Because Ms. Maiden's statements that are at issue were related to the practice of law, whether they are "prejudicial to the administration of justice" for purposes of Rules 8.4(d) and (e) turns on whether the conduct "'would negatively impact [the] perception of the legal profession' of 'a reasonable member of the public[.]'" *Markey*, 469 Md. at 501 (quoting *Basinger*, 441 Md. at 720). In *Basinger*, in concluding that the sexist and insulting

---

[2] Although we need not resolve whether Mr. Riese was a current, rather than a former and prospective, client at the time Ms. Maiden sent the 20-page letter, we find no support in the record for Ms. Maiden's contention that her representation of Mr. Riese had terminated by that time. To the contrary, Ms. Maiden's appearance for Mr. Riese was still entered in the proceeding before the EEOC, the withdrawal letter Ms. Maiden later sent to the EEOC stated that her withdrawal was effective as of December 4, two days after Ms. Maiden emailed Mr. Riese the 20-page letter, and she expressly stated in the 20-page letter she sent Mr. Riese: "I'm your attorney."

comments the lawyer made to his client (and sister-in-law) were prejudicial to the administration of justice, this Court identified five circumstances that were "critical to our conclusion": (1) the "statements were neither inartful slips of the tongue nor spoken in the heat of an oral altercation"; (2) the "statements were made at least partially in [the attorney's] capacity as [the client's] lawyer"; (3) the "statements were insults aimed at the letters' recipient . . . rather than a third party"; (4) the "statements were not limited to an isolated incident"; and (5) the lawyer used a particularly disparaging word to refer to the client. 441 Md. at 712-14.

We agree with the hearing judge's conclusion that Ms. Maiden's conduct generally shares those same characteristics. First, Ms. Maiden's statements were neither slips of the tongue nor spoken in the heat of a verbal confrontation. Instead, they were contained in a 20-page letter that the hearing judge found Ms. Maiden wrote and intended to send to Mr. Riese. Second, Ms. Maiden's statements were made entirely—not merely partially, as in *Basinger*—in her capacity as Mr. Riese's former, current, or prospective attorney. Third, the statements were directed at Mr. Riese, not a third party. Fourth, although contained largely within a single letter, the volume and repetition of the offensive statements do not allow for characterization as an "isolated incident." Fifth, even if the individual words Ms. Maiden used to describe Mr. Riese were not as inherently offensive as the sexist epithet at issue in *Basinger*, Ms. Maiden used terms that, in context, were intended to be "particularly disparaging" toward Mr. Riese and what she assumed to be his ethnic and religious background. In sum, Ms. Maiden's "egregiously unprofessional manner of communicating with" Mr. Riese "grossly exceeded an appropriate expression of

16

grievances" with him. *Id.* at 715. The sum total of her statements brings "the legal profession into disrepute" and, therefore, is prejudicial to the administration of justice. *Id.*

We therefore agree with the hearing judge that clear and convincing evidence supports the conclusion that Ms. Maiden's conduct violated Rules 8.4(d) and (e). Both sections apply to conduct by a lawyer that "is prejudicial to the administration of justice." Md. Rule 8.4(d), (e). While that, without more, violates section (d), a violation of section (e) requires that the lawyer also be acting in a professional capacity and "knowingly manifest by words or conduct . . . bias or prejudice based upon race [or] religion," among other characteristics. Md. Rule 8.4(e). For the reasons already discussed, Ms. Maiden's conduct satisfied those additional criteria.

The two other violations that the hearing judge concluded Ms. Maiden committed both arise from her representation to Bar Counsel that she had not intended to send Mr. Riese the 20-page letter. The hearing judge found that to have been a knowing and intentional misrepresentation. Although we may treat the hearing judge's findings as established in the absence of exceptions, we note that the findings on that point were especially well-supported. Ms. Maiden encrypted the letter and provided Mr. Riese with the password to access it; in multiple subsequent communications after Mr. Riese responded to the letter, Ms. Maiden did not disavow it, apologize, or show any remorse or surprise that he had received it; to the contrary, Ms. Maiden said she was not surprised by Mr. Riese's response; and the hearing judge found Ms. Maiden's later explanation of her mistake inconsistent and incredible.

17

We therefore conclude that Ms. Maiden violated Rules 8.1(a) and 8.4(c). Rule 8.1(a) provides, in relevant part, that "an attorney in connection with . . . a disciplinary matter, shall not . . . knowingly make a false statement of material fact[.]" Rule 8.4(c) provides, in relevant part, that "[i]t is professional misconduct for an attorney to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation." Ms. Maiden's conduct placed her in violation of both of those rules. *See Attorney Grievance Comm'n v. O'Neill*, 477 Md. 632, 652 (2022) ("An attorney violates [Rule 8.1(a)] when they have 'knowingly misrepresented material facts in response to Bar Counsel's requests for information.'" (quoting *Attorney Grievance Comm'n v. Yi*, 470 Md. 464, 497 (2020))); *see also Framm*, 449 Md. at 662 (stating that a Rule 8.4(c) violation occurs "when a misrepresentation is overt or based upon a concealment of material facts" (quoting *Attorney Grievance Comm'n v. Barton*, 442 Md. 91, 142 (2015))).

In sum, we agree with the hearing judge's conclusions that Ms. Maiden's conduct in sending an antisemitic and highly offensive 20-page letter to Mr. Riese and, later, knowingly and intentionally misrepresenting to Bar Counsel that she had sent the letter by mistake violated Rules 8.1(a) and 8.4(c), (d), and (e).

## II. THE APPROPRIATE SANCTION IS INDEFINITE SUSPENSION.

"In determining an appropriate sanction, 'we are motivated by our obligation to protect members of the public from attorneys who have demonstrated that they are unfit for the practice of law.'" *Attorney Grievance Comm'n v. Frank*, 470 Md. 699, 741 (2020) (quoting *Attorney Grievance Comm'n v. Kaufman*, 466 Md. 404, 428 (2019)). The sanction imposed on an attorney for violating the MARPC "'depends on the facts and

circumstances of each case, including consideration of any mitigating' and aggravating factors," *Frank*, 470 Md. at 741 (quoting *Attorney Grievance Comm'n v. Zuckerman*, 386 Md. 341, 375 (2005)), because "we impose a sanction that is commensurate with the nature and gravity of the violations and the intent with which they were committed," *Zuckerman*, 386 Md. at 375 (quoting *Attorney Grievance Comm'n v. Awuah*, 374 Md. 505, 526 (2003) (citation omitted)).

### A.     Aggravating and Mitigating Factors

The hearing judge found clear and convincing evidence of the existence of four aggravating factors. First, Ms. Maiden "demonstrated a dishonest and selfish motive when she made a material misrepresentation to Bar Counsel to conceal the truth regarding the December 2 letter sent to Mr. Riese." Second, Ms. Maiden's assertion that she mistakenly sent the letter to Mr. Riese "constituted the submission of a false statement during the disciplinary process." Third, Ms. Maiden "refused to acknowledge the wrongful nature of her conduct" by attempting to provide the hearing judge with several justifications for her behavior, including denying the existence of a conflict of interest and blaming Mr. Riese for asking her to join his case. *See Attorney Grievance Comm'n v. Aita*, 458 Md. 101, 130 (2018) ("[W]here an attorney attempts to shift blame onto the client, we prefer to focus squarely on the conduct of the attorney."). Fourth, Ms. Maiden, who was admitted to the Maryland Bar in 1997, has "substantial experience in the practice of law." The record supports the hearing judge's findings with respect to all four aggravating factors.[3]

---

[3] We have previously recognized "submission of . . . false statements . . . during the attorney discipline proceeding" as an aggravating factor. *See Attorney Grievance Comm'n*

19

The hearing judge also found by a preponderance of the evidence the existence of two mitigating factors: "(1) absence of a prior disciplinary record and (2) personal or emotional problems." The record supports the hearing judge's findings with respect to each of those mitigating factors.

## B. The Sanction

The Commission recommends that Ms. Maiden be indefinitely suspended from the practice of law. Ms. Maiden neither responded to that recommendation nor offered a contrary recommendation. In advocating for an indefinite suspension, the Commission observes that in prior cases in which we have found violations of Rules 8.4(d) or (e), we have imposed sanctions that range from a reprimand (*Basinger*, 441 Md. at 721) to an indefinite suspension (*Markey*, 469 Md. at 501). In *Basinger*, we concluded that a reprimand was the appropriate sanction for an attorney who sent his client, who was also his sister-in-law, three offensive letters that were partly related to the practice of law but also partly personal, and included in one of the letters a vulgar, sexist epithet. 441 Md. at 714. In *Markey*, we found that indefinite suspension was the appropriate sanction for two

*v. Wemple*, ___ Md. ___, Misc. Docket AG No. 69, Sept. Term, 2020, 2022 WL 2167937, at *8 (filed June 16, 2022) (quoting *Attorney Grievance Comm'n v. Shuler*, 443 Md. 494, 506-07 (2015)). Ordinarily, an aggravating factor "militate[s] in favor of a more severe sanction" for the violations at issue. *Attorney Grievance Comm'n v. Sanderson*, 465 Md. 1, 67 (2019) (quoting *Attorney Grievance Comm'n v. Kremer*, 432 Md. 325, 337 (2013)). Here, however, the identical conduct underlying the aggravating factor of making a false statement during the disciplinary process was also the basis for two of the violations at issue, those of Rules 8.1(a) and 8.4(c). As a result, that conduct is already part of our consideration of an appropriate sanction and noting it as an aggravating factor does not, under these circumstances, necessarily weigh in favor of an even more severe sanction.

attorneys who exchanged vulgar, racist, and sexist emails over a period of seven years among like-minded co-workers. 469 Md. at 501.

Ultimately, we concluded that none of our precedents is directly analogous. Although the conduct in *Markey* carried on for a significantly longer period, the statements at issue there were directed only to like-minded co-workers and were never intended to be shared outside of that group. Ms. Maiden's conduct was brief in time but extensive in volume and severity, and her offensive statements were sent to and intended to be read by their subject, who was also her client. It is also notable that neither *Basinger* nor *Markey* involved other violations, such as the significant conflict-of-interest, competence, and dishonesty violations at issue here, which further call into question Ms. Maiden's fitness to represent clients at this time.

"The virtues of character, honesty, and integrity are the cornerstone of our legal profession." *Attorney Grievance Comm'n v. Vasiliades*, 475 Md. 520, 564 (2021). Ms. Maiden's conduct in connection with her representation of Mr. Riese and its aftermath fell short of all three of these virtues. Given the severity, quantity, and multiple categories of violations presented here, we agreed with the Commission that the appropriate sanction is indefinite suspension. For that reason, we indefinitely suspended Ms. Maiden on May 11, 2022.